**FISHER BROTHERS, Goldberg Plumbing Supply Company, Inc., Standard Plumbing Supply Co., Inc., Big D Building Supply Company, Elbo Industrial Supply Co., Amity Plumbing & Heating Supply Corp., Pipeline Supply, Inc., Sherby and Sherby, Inc. t/a Cobbs Supply Co., J. Heller & Sons, Inc., Gunhill Plumbing Supply, Inc., and Kamen Supply Co., Inc., Plaintiffs,**

v.

**PHELPS DODGE INDUSTRIES, INC., Defendant.**

**Civ. A. No. 83–2457.**

United States District Court, E.D. Pennsylvania.

Feb. 20, 1985.

Seymour Kurland, Burt M. Rublin, Wolf Block, Schorr and Solis-Cohen, Leonard Barrack, Barrack, Rodos & Bacine, Philadelphia, Pa., for plaintiffs.

Duane, Morris & Heckscher, Gene E.K. Pratter, Philadelphia, Pa., for Phelps Dodge Industries, Inc.

## MEMORANDUM and ORDER

SHAPIRO, District Judge.

### INTRODUCTION

Plaintiffs brought this action individually and on behalf of a putative class of direct purchasers of copper water tubing from defendant Phelps Dodge Industries, Inc. ("Phelps Dodge"), during the period January 1, 1975 to November 30, 1982, for relief from defendants' alleged price-fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Prior to class certification pursuant to Fed.R.Civ.P. 23(c), the parties filed an agreement of settlement and dismissal. A hearing was held on plaintiffs' motion to approve the proposed settlement pursuant to Fed.R.Civ.P. 23(e) following due notice to members of the proposed settlement class. No class member objected or asked to be heard. Upon full consideration of written submissions and oral arguments in support of the settlement, the court approves the settlement as fair, reasonable and adequate.

1. Reading Industries, Inc. ("Reading"), which was then in bankruptcy proceedings in the United States Bankruptcy Court for the Eastern District of Pennsylvania, was, however, named as a co-conspirator. Pursuant to an order of the Bankruptcy Court and at the direction of Reading's secured creditors, virtually all of Reading's assets were sold to an unrelated entity. As a result, Reading was not an operating company and had no assets with which to respond to a judgment. Plaintiff for itself and on behalf of a putative class therefore could not pursue any claims against Reading in this litigation, though any putative class members could pursue claims in Bankruptcy Court.

### FACTS and PROCEDURAL HISTORY

A federal grand jury in the Eastern District of Pennsylvania began investigating alleged price-fixing in the copper water tubing industry in the summer of 1981. While the investigation was proceeding, Fisher Brothers filed a civil complaint against Cambridge-Lee Industries, Inc. ("Cambridge-Lee"), Cerro Copper Products, Inc. ("Cerro"), Halstead Industries, Inc. ("Halstead"), and Howell Metal Company, Inc. ("Howell") on November 5, 1982 (Civil Action No. 82–4921). The complaint alleged the defendants and their as yet unnamed [1] co-conspirators had engaged in a nationwide conspiracy to fix, raise, maintain or stabilize the price of copper water tubing, in violation of Section 1 of the Sherman Act. Plaintiffs also moved to certify the action as a class action. Shortly thereafter, a number of complaints with similar allegations were filed by other copper water tubing purchasers against these defendants.

On March 18, 1983, the Grand Jury returned an indictment against six corporate defendants, Cambridge-Lee, Cerro, Phelps Dodge, Reading, Revere Copper and Brass, Inc. and Revere Copper Products, Inc. (together known as the "Revere Companies") and six present or former employees of some of these companies. The indictment alleged that the corporate and individual defendants had engaged in an unlawful conspiracy to fix the prices of copper water tubing from at least 1975 until June, 1981. Subsequent to the indictment, plaintiffs and defendants Cambridge-Lee, Cerro, Halstead and Howell, stipulated to class certification and related matters in the pending civil litigation. The court, by order entered April 29, 1983, approved the stipulated class defined as follows:

All individuals, proprietorships, partnerships, corporations and other business entities in the United States (excluding defendants, their parents, subsidiaries and affiliates, and their alleged co-conspirators) who have, during the time period 1975 through November, 1982, purchased copper water tubing directly from one or more of the defendants (including defendants' subsidiaries and affiliates) or their alleged co-conspirators.

Prior to the criminal trial, Fisher Brothers and a number of other plaintiffs filed this joint complaint (Civil Action No. 83–2457) against Phelps Dodge [2] on May 23, 1983, and moved for class certification in this action on June 20, 1983. Phelps Dodge opposed this motion on the ground that its activity in the copper water tubing industry was more limited in time and geographical area than that of the defendants in the cases consolidated at Civil Action No. 82–4921 (the Master File case). Before the court decided this motion, Phelps Dodge reached a settlement with plaintiffs; the Agreement of Settlement was executed on August 23, 1983.

This Agreement provided that Phelps Dodge would pay $2.5 million in escrow for the benefit of the settlement class designated as:

All individuals, proprietorships, partnerships, corporations and other business entities in the United States (excluding defendants, their parents, subsidiaries and affiliates, and their alleged co-conspirators) who have, during the time period January 1, 1975 through November 30, 1982 (the "covered period"), purchased copper water tubing directly from one or more of the defendants (including defendants' parents, subsidiaries and affiliates) or their alleged co-conspirators.

This settlement amount would not affect any joint or several liability of any other defendant or alleged co-conspirator.[3]

Under the terms of the Agreement, Phelps Dodge retained the right to withdraw from the settlement under certain conditions. First, Phelps Dodge could withdraw if, within twenty (20) days after the date by which class members had to act to exclude themselves from the class, Phelps Dodge in its sole judgment determined that class members requesting exclusion had made "substantial purchases" of copper water tubing from Phelps Dodge during the relevant time period.[4] Second, the Agreement contained a "most favored nations" clause giving Phelps Dodge the right to terminate the settlement or obtain more favorable terms if plaintiffs subsequently settled with a "similarly situated" defendant on more favorable terms unless the circumstances materially changed so that plaintiffs might reasonably conclude that the prospect or amount of ultimate recovery from an otherwise similarly situated defendant had been substantially reduced. (Favorability would be determined by comparing the ratio of amount of settlement to percentage of sales made during calendar years 1979–1982.)

Consideration of preliminary approval of this settlement was delayed to permit conclusion of the criminal trial of *United States v. Cambridge-Lee Industries, Inc., et al.*, Criminal No. 83–107. After a nine-week trial before Judge Huyett, the remaining defendants,[5] including Phelps

---

2. On April 4, 1983, plaintiffs had moved for leave to file a joint consolidated amended complaint naming Phelps Dodge and the indicted individuals as additional defendants in Civil Action No. 82–4921. The court refused to permit this and required instead that claims against the individual defendants be severed and stayed. (Subsequently, the individual defendants were dismissed). The court coordinated the Phelps Dodge cases with Civil Action No. 82–4921 (the Master File case) for pretrial purposes.

3. Phelps Dodge paid $2.5 million into escrow on November 21, 1983; to date interest in excess of $300,000 has been earned.

4. On January 16, 1985, Phelps Dodge, having available the list of class members who excluded themselves from the class (Exhibit A attached hereto), notified the court that it would not exercise its right to withdraw from the settlement.

5. Prior to trial, Reading and the Revere Companies entered pleas of *nolo contendere* to the charges against them.

Dodge, were found not guilty on December 22, 1983.

A hearing to consider whether to send notice of the Phelps Dodge settlement to the settlement class pursuant to Rule 23 was held on January 25, 1984. But the court postponed notice of a hearing on final approval in order to consider whether: i) the settlement class in Civil Action No. 83–2457 should be the same as the stipulated class in the Master File case; ii) adequate notice could be sent to the settlement class if there were no provision in the Agreement for ascertaining the identity of purchasers from alleged co-conspirators; and iii) there was an adequate basis for determining the "present circumstances" of defendants, so that the court could interpret the effect of the "most favored nations" clause; Opinion of January 18, 1984.

During the spring of 1984, plaintiffs achieved separate settlements with Howell and Halstead and, in the fall of 1984, with the Revere Companies (which were then in bankruptcy proceedings). The court preliminarily approved the settlements with Phelps Dodge, Howell, Halstead and Revere Companies on October 29, 1984 and directed that notice of the proposed settlements be sent to the settlement class [6] and published twice in all regional editions of *The Wall Street Journal.* Pursuant to the court's Order, counsel for the class sent notice informing all class members that a court hearing to determine whether the proposed settlements were fair, reasonable and adequate would be held on January 11, 1985. The notice also stated that any member of the class could appear and be heard at the hearing to object to the settlements, that any member of the class could opt out, but that all class members not so excluded would be bound by the settlement if approved by the court. Proof of mailing this

notice was filed with the court on November 26, 1984 and supplemented at the hearing on January 11, 1985; proof of publication of the notice and class members requesting exclusion from the class were also made part of the record at that hearing.

The court, having considered the written and oral submissions of January 11, 1985 in support of the Phelps Dodge settlement as well as the lack of opposition thereto, now determines upon an independent evaluation of the proposed settlement that it is fair, reasonable and adequate.

### APPROVAL OF SETTLEMENT

██ Rule 23(e) of the Federal Rules of Civil Procedure mandates court approval of a class action settlement:

> A class action shall not be dismissed or compromised without the approval of the Court, and notice of the proposed dismissal or compromise shall be given to all members of the class ....

Approval of a proposed class action settlement is discretionary with the court. *Girsh v. Jepson,* 521 F.2d 153, 156 (3d Cir.1975); *Ace Heating & Plumbing Company v. Crane Company,* 453 F.2d 30, 34 (3d Cir.1971). Settlement is a course favored by law, *Weight Watchers of Philadelphia, Inc. v. Weight Watchers International, Inc.,* 455 F.2d 770, 773 (2d Cir.1972), but a settlement will be approved only if it is "fair, adequate, and reasonable" to the members of the class, *Walsh v. Great Atlantic and Pacific Tea Company, Inc.,* 726 F.2d 956, 965 (3d Cir.1983). The settlement must be both substantively reasonable compared to the likely rewards of litigation, *Shlensky v. Dorsey,* 574 F.2d 131, 147 (3d Cir.1978), and the result of good faith, arms length negotiations, *Weinberger v. Kendrick,* 698 F.2d 61, 74 (2d Cir.1982).

---

**6.** For purposes of these settlements, plaintiffs and defendants Phelps Dodge, Howell, Halstead and the Revere Companies all agreed to the following settlement class:

> All individuals, proprietorships, partnerships, corporations and other business entities in the United States (excluding defendants, their parents, subsidiaries and affiliates, and their al-

leged co-conspirators) who have, during the time period January 1, 1975 through November 30, 1982 (the 'covered period'), purchased copper water tubing directly from one or more of the defendants (including defendants' parents, subsidiaries and affiliates) or their alleged co-conspirators.

Various courts have attempted to specify factors to be considered prior to decision upon the fair, reasonable, and adequate nature of a proposed class action settlement. *See Malchman v. Davis,* 706 F.2d 426, 433–34 (2d Cir.1983) (nine factors); *Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983) (six factors); *Officers for Justice v. Civil Service Commission,* 688 F.2d 615, 625 (9th Cir.1982), *cert. denied,* 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983) (eight factors). In *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975), this Circuit noted the relevancy of the following nine factors in determining the fairness of a settlement:

> ... (1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation....

*Girsh,* 521 F.2d at 157 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974)).

A. *Burdens of Litigation*

For a period of time after the first complaint was filed, all defendants were adamant in refusing to consider settlement on any terms acceptable to plaintiffs. Phelps Dodge's willingness to come to the bargaining table and plaintiffs' willingness to settle with Phelps Dodge indicated to other defendants that representatives of the class were willing to engage in good faith bargaining and was helpful to the interests of the class. This settlement was also achieved prior to expensive and time-con-

suming discovery[7] which saved the class some attorneys' fees expenses. Nonetheless counsel for the class was already well informed of the strengths and weaknesses of their case from their investigation of the alleged conspiracy prior to filing the complaint and certain documents available from the criminal proceedings. This settlement was therefore achieved at a time when both sides possessed sufficient information to reach a fair agreement.

Phelps Dodge agreed to a nationwide class solely for settlement purposes. If the case had been litigated, Phelps Dodge intended to contest vigorously plaintiffs' class certification motion because it sold copper water tubing only in the western United States. After considering Phelps Dodge's arguments, the court might not have certified the proposed settlement class. Therefore, the settlement may benefit a broader class than would a subsequent judgment in favor of a class.

This proposed settlement was achieved prior to the conclusion of the criminal trial. Phelps Dodge's subsequent acquittal in the criminal case made clear that ultimate success in a civil claim was by no means assured. Defendant consistently maintained that its activities were lawful in all respects and that no nationwide conspiracy to price-fix could be proved. Phelps Dodge further asserted that any price communications with other copper water tubing manufacturers were lawful "price verifications," and argued that the copper water tubing industry was highly competitive. (Phelps Dodge abandoned the copper water tubing business in 1983 while other manufacturers, e.g., Revere, Reading have gone into bankruptcy.)

Even if plaintiffs were to prevail on liability, causation as to damages would have to be proved. If plaintiffs' contention that common evidence could be utilized to prove damages did not prevail, the defendant's exposure might have been significantly reduced. Plaintiffs would also have had the

---

**7.** Pretrial Order No. 11 stayed discovery on the merits until the court determined the issue of

class certification. The settlement was reached prior to this determination.

burden of showing that defendants fraudulently concealed their conspiratorial price-fixing activities during 1975–1978 to establish liability for price-fixing damages sustained earlier than four years preceding the filing of the complaint.

But Phelps Dodge also had good reason to avoid the uncertainty of litigation. Plaintiffs maintained that various actions taken by the copper water tubing manufacturers would demonstrate to a jury the existence of a pervasive conspiracy. While the government failed to secure a conviction under the "beyond a reasonable doubt" criminal standard, plaintiffs' counsel might have proved that a price-fixing conspiracy was "more probable than not." The availability of treble damages to a successful plaintiff also enters into a defendant's decision to avoid the risks of litigation.

### B. *Reaction of the Class*

Notices of the settlement were mailed to more than 37,000 members of the settlement class and twice published in *The Wall Street Journal,* but only forty-six entities, or .13% of the class, have opted to exclude themselves from the settlement and no member of the class has raised any objection to the proposed settlement. "[T]his unanimous approval of the proposed settlements by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlements." *See, In re Art Materials Antitrust Litigation,* 100 F.R.D. 367, 382 (N.D.Ohio 1983).

### C. *Amount of the Settlement*

■ The court must review a settlement to determine whether it falls within a "range of reasonableness," not whether it is the most favorable possible result of litigation. *See Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.), *cert. denied sub nom., Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972) ("in any case there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in

any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion"). Because of these inherent risks of litigation, "the vast majority of courts which have approved settlements in [antitrust class actions] ... have given their approval to settlements which are traditionally based on an estimate of single [rather than treble] damages," *City of Detroit v. Grinnell Corp.,* 495 F.2d at 458.

The $2.5 million settlement represented approximately 2.4% of sales of $102.7 million during 1979–82, the four years prior to the filing of the complaint; the statutory limitations period governing antitrust claims is four years. *See, e.g., In re Anthracite Coal Antitrust Litigation,* 79 F.R.D. 707, 714 (M.D.Pa.1978). The settlement sum is within the range of settlement recoveries which have been approved at final settlement hearings in other major multidistrict class litigations. *See, e.g., In re Armored Car Antitrust Litigation,* 472 F.Supp. 1357 (M.D.Ga.1979), *aff'd in part, rev'd in part,* 645 F.2d 488 (5th Cir.1981) (3.88%); *In re Anthracite Coal Antitrust Litigation,* 79 F.R.D. 707 (M.D.Pa.1978) (settlement of 3% of sales). The parties propose that the settlement fund (to be distributed in accordance with a plan of allocation approved by the court) be distributed to class members in proportion to their purchases of copper water tubing from Phelps Dodge or any of its alleged co-conspirators during the period January 1, 1975 through November 30, 1982; this plan of allocation is fair and easy to administer.

A most favored nation clause in the Phelps Dodge agreement permits Phelps Dodge to terminate or seek more favorable treatment if plaintiffs settle more favorably with other defendants; settlement favorability is determined by comparing each defendant's settlement amount as a percentage of its total sales, without regard to the relative guilt or innocence of any defendant.[8] But this clause is inapplicable if "present circumstances materially change."

---

8. Another form of most favored nation clause is    designed to preserve a "damage ratio"; that is,

Phelps Dodge settled prior to the criminal trial; the subsequent acquittals of Cambridge-Lee and Cerro might have had an "obvious, significant, and substantial impact on the progress of the settlements in the civil class action," *In re Corrugated Container Antitrust Litigation*, 1983–1 Trade Reg.Rep. (CCH) ¶ 65,451 (S.D.Tex. February 2, 1983). Whether or not these subsequent acquittals in the criminal trial constituted a material change in circumstances that would render the most favored nations clause inoperative may be determined by the court if the remaining defendants settle on terms to which Phelps Dodge objects. While the most favored nations clause is frequently considered undesirable, *see Manual for Complex Litigation*, § 1.46 (5th ed. 1981), in these circumstances, the presence of a most favored nations clause does not suggest disapproval of this settlement agreement.

## D. *Negotiation Process*

■ Though the court must independently evaluate the proposed settlement, the professional judgment of counsel involved in the litigation is entitled to significant weight. "[A] court should refrain from merely substituting its own judgment of the merits of a settlement for that of counsel intimately associated with the litigation and consequently far more able to weigh its relative strengths and weaknesses." *Jamison v. Butcher & Sherrerd*, 68 F.R.D. 479, 481 (E.D.Pa.1975).

The decision to settle on negotiated terms without pursuing lengthy and costly litigation involving significant risk was made by highly experienced counsel, especially competent with regard to class action litigation. Seymour Kurland and Leonard Barrack, and associated counsel, have handled numerous class actions with considerable success; they were personally involved with all aspects of this settlement negotiation and their decision to accept this settlement agreement on behalf of the class was made after a thorough evaluation of all relevant factors, including the competence, experience and tenacity of opposing counsel. There has been no suggestion that these settlements were not conducted in good faith at arms length. Because this settlement "bears the imprimatur of seasoned and experienced counsel ...," *Blank v. Talley Industries, Inc.*, 64 F.R.D. 125, 132 (S.D.N.Y.1974), the court has particular confidence that the agreement is in the best interests of the class.

## CONCLUSION

■ Therefore, the court finds that the Phelps Dodge settlement provides the class members with a significant and unopposed benefit which, when weighed against the costly and uncertain prospect of obtaining judgment at trial, is clearly in the interest of the class as a whole. Relying on these factors, the judgment of experienced class counsel that the settlement is acceptable, and the absence of objection by any class member after due notice, the court approves the settlement as fair, reasonable and adequate.

## JUDGMENT ORDER

AND NOW, this 20th day of February, 1985, for the reasons stated in the foregoing Memorandum, the court finds that:

1. The terms of the Agreement of Settlement are fair, reasonable, and adequate to the class.

2. All class members have been served with notice of the proposed Agreement of Settlement and the hearing thereon, either directly or by publication in accordance with the court's order of October 29, 1984 directing same.

3. Notice by mail and publication was the best practicable in the circumstances.

THEREFORE, it is ORDERED that:

1. This settlement is approved on behalf of the following class, except all members

---

the clause ensures that future settlements recover for the class at least a certain percentage of

the (tainted) sales reflecting price-fixing by defendants.

who have excluded themselves and are listed in Exhibit A:

All individuals, proprietorships, partnerships, corporations and other business entities in the United States (excluding defendants, their parents, subsidiaries and affiliates, and their alleged co-conspirators) who have, during the time period January 1, 1975 through November 30, 1982 (the "covered period"), purchased copper water tubing directly from one or more of the defendants (including defendants' parents, subsidiaries and affiliates) or their alleged co-conspirators.

2. Each plaintiff and member of the class who did not timely exclude itself is deemed to have agreed forever to refrain from proceeding against defendant Phelps Dodge Industries, Inc., its successors, assigns, affiliates, subsidiaries and predecessors, and any and all of its present and former directors, employees and agents, on any claims and causes of action which have been, might have been, are now or could be asserted in this action, and which are based upon allegations of collusion, combination or conspiracy or other conduct which might have been asserted under the federal antitrust laws with respect to the sale of copper water tubing during the period January 1, 1975 to November 30, 1982.

3. Without affecting the finality of this judgment in any way, this court reserves jurisdiction over the implementation of the settlement, including approving a final plan of distribution, resolving disputed claims by any class member, and awarding attorneys' fees and any additional expenses.

4. In accordance with the court's findings herein, the Clerk of the Court is directed to enter final judgment pursuant to Fed. R.Civ.P. 54(b).