**FISHER BROTHERS, Goldberg Plumbing Supply Company, Inc., Standard Plumbing Supply Co., Inc., Big D Building Supply Company, Elbo Industrial Supply Co., Amity Plumbing & Heating Supply Corp., Pipeline Supply, Inc., Sherby and Sherby, Inc. t/a Cobbs Supply Co., J. Heller & Sons, Inc., Gunhill Plumbing Supply, Inc., and Kamen Supply Co., Inc., Plaintiffs,**

v.

**PHELPS DODGE INDUSTRIES, INC., Defendant.**

Civ. A. No. 83–2457.

United States District Court, E.D. Pennsylvania.

July 26, 1985.

---

378

Franklin Poul, Seymour Kurland, Burt M. Rublin, Wolf, Block, Schorr & Solis-Cohen, Leonard Barrack, Philadelphia, Pa., for plaintiffs.

Henry T. Reath, Judith Renzulli, Duane, Morris & Heckscher, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

SHAPIRO, District Judge.

### INTRODUCTION

Before the court is the motion of defendant Phelps Dodge Industries, Inc. ("Phelps Dodge") to enforce its settlement agreement with plaintiff class. Phelps Dodge contends that plaintiff class violated the most favored nations clause of this settlement agreement by settling with similarly situated defendant Cerro Copper Products, Inc. ("Cerro") on more favorable terms than plaintiff class had settled with Phelps Dodge. Phelps Dodge seeks as relief a partial refund with accumulated interest of the amount it has paid in settlement.[1] Plaintiff class concedes that Cerro obtained more favorable settlement terms but argues that Phelps Dodge's most favored nations clause was rendered inoperative by a material change in circumstances surrounding this antitrust litigation between Phelps Dodge's August 23, 1983 settlement and Cerro's February 7, 1985 settlement.

---

1. Initially, Phelps Dodge also alleged that defendant Cambridge-Lee Industries, Inc. was similarly situated to Phelps Dodge and that Cambridge-Lee's settlement with plaintiff class violated the most favored nations clause. However, Phelps Dodge withdrew this contention after reviewing confidential documents provided to it by Cambridge-Lee. Therefore, only considerations regarding Phelps Dodge and Cerro are relevant to the court's decision on this aspect of this antitrust litigation.

This court held an evidentiary hearing on May 24 and May 28, 1985, and now denies Phelps Dodge's motion to enforce the most favored nations clause of its settlement agreement.

## PROCEDURAL HISTORY

A federal grand jury in the Eastern District of Pennsylvania began investigating alleged price-fixing in the copper water tubing industry in the summer of 1981. While this investigation was proceeding, Fisher Brothers filed against four copper water tubing manufacturers and wholesalers, including Cerro, and certain individual defendants,[2] a civil complaint alleging that these defendants and their as yet unnamed co-conspirators had engaged in a nationwide conspiracy to fix, raise, maintain or stabilize the price of copper water tubing in violation of Section I of the Sherman Act, 15 U.S.C. § 1 (Civil Action No. 82–4921). Phelps Dodge was not named as a defendant.

On March 18, 1983, the grand jury returned an indictment against six corporate defendants, including both Cerro and Phelps Dodge, and six present or former employees of some of these companies.[3] The indictment alleged that the corporate and individual defendants had engaged in an unlawful conspiracy to fix the prices of copper water tubing from at least 1975 until June, 1981. After the indictment but prior to the criminal trial, Fisher Brothers and a number of other plaintiffs filed a joint complaint (Civil Action No. 83–2457) against Phelps Dodge[4] on May 23, 1983,

and moved for class certification in this action on June 20, 1983. Before this motion was ripe for decision, Phelps Dodge reached a settlement with plaintiffs; the Agreement of Settlement was executed on August 23, 1983.

This Agreement provided that Phelps Dodge would place $2.5 million in escrow for the benefit of a settlement class designated as:

All individuals, proprietorships, partnerships, corporations and other business entities in the United States (excluding defendants, their parents, subsidiaries and affiliates, and their alleged co-conspirators) who have, during the time period 1975 through November, 1982 (the 'covered period'), purchased copper water tubing directly from one or more of the defendants (including defendants' subsidiaries and affiliates) or their alleged co-conspirators.

The $2.5 million settlement fund represented approximately 2.4% of Phelps Dodge's $102.7 million in copper water tubing sales during 1979–1982. This agreement also contained a most favored nations clause giving Phelps Dodge the right to terminate the settlement or seek a partial refund of its settlement fund if plaintiffs subsequently settled with a "similarly situated" defendant on more favorable terms unless circumstances materially changed so that plaintiffs reasonably concluded that the prospect or amount of ultimate recovery from an otherwise similarly situated defendant had been substantially reduced.[5]

---

**2.** Individual defendants were severed and actions against them stayed; Civil Action No. 82–4921 (the Master File case) proceeded against four corporate defendants on behalf of a stipulated class.

**3.** None of the indicted individuals was a Phelps Dodge employee; two were Cerro employees.

**4.** On April 4, 1983, plaintiffs had moved for leave to file a joint consolidated amended complaint naming Phelps Dodge and the indicted individuals as additional defendants in Civil Action No. 82–4921. The court denied this motion but coordinated the *Phelps Dodge case* with Civil Action No. 82–4921 (the Master File case) for pretrial purposes.

**5.** Paragraph 14 of the Phelps Dodge Agreement of Settlement states:

Plaintiffs agree that, unless present circumstances materially change so that plaintiffs reasonably conclude that the prospect or amount of ultimate recovery from any similarly situated defendant is substantially lessened or reduced, they will not enter into a settlement of the class actions in Master File No. 82–4921 with any such similarly situated defendant that is more favorable *to such defendant* insofar as it relates to the payment provided for in paragraph 5 of the Agreement (such determination to be based upon the ratio of the amount paid by a defendant in settlement of such actions to the defendant's

Favorability of settlement terms would be determined by calculating for each settling defendant the amount of settlement as a percentage of that defendant's dollar sales of copper water tubing during 1979–82 inclusive and comparing this figure to Phelps Dodge's 2.4% settlement ratio.

Consideration of preliminary approval of this settlement was delayed pending termination of the criminal trial of *United States v. Cambridge-Lee Industries, Inc., et al.*[6] After a nine-week trial, all remaining defendants were acquitted on December 22, 1983.

A hearing on whether to grant preliminary approval of the Phelps Dodge settlement and notify the settlement class was held on January 25, 1984. *See* Memorandum and Order dated January 18, 1984 (finding it appropriate to hold a hearing on preliminary approval at that time). At this hearing there was extensive discussion of the meaning of the most favored nations clause. This court preliminarily approved the Phelps Dodge settlement on October 31, 1984 and approved it as fair, reasonable and adequate on February 20, 1985. *See Fisher Brothers, et al. v. Phelps Dodge Industries, Inc.,* 604 F.Supp. 446 (E.D.Pa. 1985). With regard to the most favored nations clause, the court there noted that:

> ... the subsequent acquittals of Cambridge-Lee and Cerro might have had an 'obvious, significant, and substantial impact on the progress of the settlements in the civil class action,' *In re Corrugated Container Antitrust Litigation,* 1983–1 Trade Reg.Rep. (CCH) ¶ 65,451 (S.D.Tex. February 2, 1983). Whether or not these subsequent acquittals in the criminal trial constituted a material change in circumstances that would render the most favored nations clause inoperative may be determined by the court if the remaining defendants settle on terms to which Phelps Dodge objects. While the most favored nations clause is frequently considered undesirable, *see Manual for Complex Litigation,* § 1.46 (5th ed. 1981), in these circumstances, the presence of a most favored nations clause does not suggest disapproval of this settlement agreement.

*Id.* at 452.

Following prolonged negotiations, plaintiffs entered into a settlement with defendant Cerro on February 7, 1985 for the sum of $3,285,000. The court preliminarily approved the proposed Cerro settlement at a hearing held on March 29, 1985. (3/29/85 Tr. p. 15). At this hearing, and also by letter dated April 5, 1985, Phelps Dodge notified the court and plaintiffs of its contention that the Cerro settlement violated Phelps Dodge's most favored nations clause. On April 29, 1985, Phelps Dodge filed a motion to enforce the most favored nations clause of its settlement agreement.

This court scheduled an evidentiary hearing on Phelps Dodge's motion for May 24, 1985.[7] *See In re Corrugated Container Antitrust Litigation,* 752 F.2d 137 (5th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 3536, 87 L.Ed.2d 660 (1985) (reversing the district court for not conducting an evidentiary hearing where there existed factual disputes concerning the applicability of a most favored nations clause, but not criti-

---

sales of copper water tubing during the calendar years 1979–82) or to any other protective provisions based on federal legislation which effectively overrules *Illinois Brick Co. v. Illinois,* 431 U.S. [720] 729 [97 S.Ct. 2061, 2066, 52 L.Ed.2d 707] (1977), without offering similar terms to PDI [Phelps Dodge]. In such event, PDI [Phelps Dodge] shall have the option of accepting such more favorable terms and receiving proportionate reimbursement from the Fund, or terminating this Agreement.

**6.** Prior to trial, three corporate defendants, Reading Industries, Revere Copper and Brass, Inc., and Revere Copper Products, Inc., entered pleas of *nolo contendere.*

**7.** On April 26, 1985, Phelps Dodge, moving for a postponement of this hearing, argued that its motion was not ripe for adjudication until after the court gave final approval to the Cerro settlement. The court denied this motion because the most favored nations clause permitted Phelps Dodge to seek termination of its settlement or a refund in the event that plaintiffs "enter[ed] into" (Paragraph 14, Phelps Dodge Agreement of Settlement) a settlement with a similarly situated defendant. *See* Pretrial Order No. 62.

cizing the district court's ruling that acquittals in a criminal antitrust trial were a material change in circumstances influencing the prospect and amount of settlement in the related civil litigation.)

Prior to the hearing, this court allowed some discovery; one of plaintiff's co-lead counsel responded in expedited fashion to three of four contention interrogatories filed by Phelps Dodge. Phelps Dodge also requested leave to depose plaintiffs' co-lead counsel, other counsel for plaintiff class, and at least one named plaintiff. The court denied these depositions on the ground that, if the court were to determine that Phelps Dodge had the right to terminate its settlement and the case against Phelps Dodge then went to trial, plaintiffs would be unduly prejudiced if Phelps Dodge had compelled testimony under oath concerning plaintiffs' litigation strategy, estimated potential recovery, and so on. On May 21, 1985, Phelps Dodge formally abandoned its option to seek termination and thereafter contended only that it was entitled to partial refund of the $2.5 million paid in settlement plus accrued interest; it renewed its request to take depositions of plaintiffs' counsel and compel plaintiffs to respond fully to the unanswered contention interrogatory. But this court did not permit additional discovery because plaintiffs might still proceed to trial against those defendants whose settlements have not been finally approved. Additionally, because Phelps Dodge had an ample opportunity to decide to seek a partial refund rather than terminate its settlement agreement, this court viewed Phelps Dodge's untimely renewal of its discovery requests as a delaying tactic designed to undermine the court's decision not to postpone the evidentiary hearing.[8] The court remains of the view that determination of the Phelps Dodge status prior to the final hearing on approval of settlement and attorneys' fees is in the interest of the members of the class.

The evidentiary hearing was held on May 24 and May 28, 1985. At this hearing the court took judicial notice of proceedings in the related criminal trial and of prior proceedings in this civil litigation.

## ENFORCEMENT OF THE MOST FAVORED NATIONS CLAUSE

■ There are two types of most favored nations clauses. The traditional most favored nations clause is an unconditionally worded clause that prohibits plaintiffs from making a later settlement with remaining defendants on terms more favorable than the settlement plaintiffs made with an early-settling defendant, without giving the early-settling defendant a refund to equalize the earlier and later settlements. *The Manual for Complex Litigation* criticizes this type of most favored nations clause as an impediment to subsequent settlements. Manual for Complex Litigation § 1.46 (5th Ed.1982). *See also, In re Chicken Antitrust Litigation,* 560 F.Supp. 943 (N.D.Ga.1979) (granting motion to strike unconditional most favored nations clauses from settlement agreements).

A qualified or conditional most favored nations clause permits flexibility because of financial or other differences among defendants, or a material change in circumstances relevant to the litigation. The purpose of a qualified or conditional clause is to ensure an early settling defendant that plaintiffs will vigorously pursue their case against remaining defendants.[9] This type

---

**8.** In *In re Corrugated Container Antitrust Litigation,* 752 F.2d 137 (5th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 3536, 87 L.Ed.2d 660 (1985), the Fifth Circuit Court of Appeals did not decide whether discovery must be allowed prior to an evidentiary hearing on enforcement of a most favored nations clause. But in reversing the district court, the Court of Appeals noted that "Green Bay also served interrogatories and a document production request. Plaintiffs object-ed to these discovery efforts and Green Bay filed a motion to compel discovery, but the district court has never ruled on the motions." 752 F.2d at 140. Green Bay did not request any depositions.

**9.** Of course, this same assurance can be provided by the court which is obligated by Federal Rule of Civil Procedure 23 to approve only those class action settlements that it finds fair,

of most favored nations clause is not considered in *The Manual for Complex Litigation;* it was enforced by the district court in *In re Corrugated Container Antitrust Litigation,* 1983–1 Trade Reg. Reports (CCH) ¶ 65,451 (S.D.Tex.1983), *rev'd,* 752 F.2d 137 (5th Cir.) (remanding for evidentiary hearing), *cert. denied,* —— U.S. ——, 105 S.Ct. 3536, 87 L.Ed.2d 660 (1985).

■ The clause at issue here is of the latter type; Phelps Dodge's option to enforce the clause applies only to similarly situated defendants and only if circumstances have not materially changed. Plaintiffs concede (and Cerro does not dispute this concession) that Phelps Dodge and Cerro were similarly situated defendants. It is also undisputed that Phelps Dodge's $2.5 million settlement represents a 2.4% ratio of settlement to 1979–82 sales of $102.7 million, and that Cerro's $3,825,000 settlement represents a .88% ratio of settlement to 1979–82 sales of $434.3 million. The only issue before this court is whether Phelps Dodge can enforce its most favored nations clause to obtain a partial refund of its settlement amount,[10] or whether the most favored nations clause is inoperative because circumstances had materially changed from August 23, 1983 (when Phelps Dodge entered into its settlement agreement) to February 7, 1985 (when Cerro entered into its settlement agreement) so that plaintiffs could reasonably conclude that the prospect or amount of ultimate recovery from Cerro was substantially reduced.

Plaintiffs contend that the December 22, 1984 acquittals of Phelps Dodge, Cerro and other remaining defendants in the criminal antitrust trial constituted a material change in circumstances that substantially reduced the ultimate value of the civil antitrust cases arising out of the same allegations of unlawful price fixing in the copper water tubing industry. Phelps Dodge responds that whatever detrimental effect the acquittals might have had on plaintiffs' case was not material and was more than compensated for by additional evidence of an unlawful conspiracy involving Cerro that plaintiffs obtained through discovery conducted after the criminal trial.

To explicate the parties' interpretation of the most favored nations clause, we examine the record of correspondence between counsel for plaintiff class and counsel for Phelps Dodge. On June 28, 1983, Seymour Kurland, Esquire, co-lead counsel for plaintiff class, confirmed in a letter to Andrew Hartzell, Jr., Esquire, who with Henry Reath, Esquire was counsel for Phelps Dodge, that the parties agreed to settle Phelps Dodge's potential liability in this antitrust litigation for $2.5 million. Mr. Kurland also wrote that Mr. Hartzell would prepare the first draft of the settlement agreement and enclosed for his use a copy of a settlement agreement used in the *Corrugated Container* case. (Pl. Ex. 3). The *Corrugated Container* settlement contained a conditional most favored nations clause.[11]

Mr. Hartzell sent to Mr. Kurland on July 12, 1983 a draft settlement agreement containing a traditional, unconditional most favored nations clause. (Pl. Ex. 4). On July 26, 1983, Mr. Hartzell sent to Mr. Kurland a revised version of the settlement agreement; this version contained a partially conditional most favored nations clause. It provided that Phelps Dodge's option to terminate the settlement or seek a refund

---

reasonable, and adequate; reliance on the court rather than a most favored nations clause has the advantage of eliminating the potential for just the sort of litigation we are now here engaged in.

**10.** If Phelps Dodge prevailed on its motion, it would be entitled to a refund of $1,591,040 (the difference between 2.4% × $102.7 million sales and .88% × $102.7 million sales, or $2,464,800 minus $903,760 which equals $1,561,040), plus a

proportionate share of the interest earned to date on its $2.5 million payment.

**11.** The *Corrugated Container* most favored nations clause would apply "unless present circumstances materially change so that plaintiffs reasonably conclude that the prospect or amount of ultimate recovery from any similarly situated defendant is substantially lessened or reduced...." 752 F.2d at 139 n. 3.

would exist only if plaintiffs settled more favorably with a similarly situated defendant but contained no provision rendering the clause inapplicable on account of changes in material circumstances.

Mr. Kurland responded on August 4, 1983 and enclosed plaintiffs' "final draft" of the settlement agreement. This draft contained a conditional most favored nations clause:

Plaintiffs agree that, unless present circumstances materially change so that plaintiffs reasonably conclude that the prospect or amount of ultimate recovery from any similarly situated defendant is substantially lessened or reduced, they will not enter into a settlement of the class actions in Master File No. 82–4921 with any such similarly situated defendant that is more favorable to such defendant insofar as it relates to the payment provided for in paragraph 5 of the Agreement (such determination to be based upon the ratio of the amount paid by a defendant in settlement of such actions to the defendant's sales of copper water tubing during the calendar years 1979–82), without offering similar terms to PDI [Phelps Dodge]; *provided*, however, that if PDI [Phelps Dodge] accepts said offer, it agrees to pay such additional amount as necessary to make the aggregate amount paid by PDI [Phelps Dodge] proportionately equal to the aggregate amount paid by such other similarly situated defendant.

In his accompanying letter, Mr. Kurland wrote, "[w]ith respect to the most favored nations clause, we are willing to give you a stronger clause if it is limited solely to Cerro." (Pl. Ex. 6). Mr. Hartzell testified he did not agree to limit the clause to Cerro because he wanted to "keep it open [to include other defendants]." (5/28/85 Tr. p. 252).

The final agreement contained Kurland's qualified clause, applicable to all defendants, but the proviso subjecting Phelps Dodge to the risk of having to increase its settlement amount was eliminated. The final clause stated:

Plaintiffs agree that, unless present circumstances materially change so that plaintiffs reasonably conclude that the prospect or amount of ultimate recovery from any similarly situated defendant is substantially lessened or reduced, they will not enter into a settlement of the class actions in Master File No. 82–4921 with any such similarly situated defendant that is more favorable to such defendant insofar as it relates to the payment provided for in paragraph 5 of the Agreement (such determination to be based upon the ratio of the amount paid by a defendant in settlement of such actions to the defendant's sales of copper water tubing during the calendar years 1979–82) or to any other protective provisions based on federal legislation which effectively overrules *Illinois Brick Co. v. Illinois*, 431 U.S. [720] 729 [97 S.Ct. 2061, 2066, 52 L.Ed.2d 707] (1977), without offering similar terms to PDI [Phelps Dodge]. In such event, PDI [Phelps Dodge] shall have the option of accepting such more favorable terms and receiving proportionate reimbursement from the Fund, or terminating this Agreement.

At the May 28, 1985 hearing, Mr. Hartzell testified that he understood Mr. Kurland's reference to a "stronger clause" to mean "one with no qualifications." (5/28/85 Tr. p. 251). He also testified that the clause contained in the final agreement was the qualified form, "basically if not literally the same [as the *Corrugated* clause]." (Tr. at 252). However, Mr. Hartzell stated that he never agreed that the district court holding in *Corrugated Container*, that plaintiffs could reasonably conclude that acquittals in the criminal case were a material change in circumstances substantially lessening the prospect or amount of ultimate recovery from the nonsettling defendants, would govern the interpretation of Phelps Dodge's most favored nations clause. (5/28/85 Tr. at 252). But Mr. Hartzell did confirm at the hearing that "I'm quite certain that I know I was familiar with that opinion." (*Id.*).

By the time of the January 25, 1984 hearing on preliminary approval of the Phelps Dodge settlement, the criminal case had resulted in acquittals of all defendants going to trial. The parties were permitted to state their positions on the applicability of the most favored nations clause to the acquitted defendants. But the court determined that the matter was not then before the court and declined to rule.

Mr. Kurland stated for plaintiffs that:

The most favored nations clause in this case follows the one of proof by Judge Singleton [in *Corrugated Container* ] almost word for word and on which there was a judicial approval of the most favored nations clause, and Judge Singleton in that case found that it was obviated when there was an acquittal in the criminal case.... So there is precedent that that is so.

(1/25/84 Tr. p. 47–48). Lowell Sachnoff, Esquire, counsel for Cerro, stated emphatically his opinion that the acquittals constituted a material change in circumstances:

I can't conceive of anything that could happen in a litigation like this that's more substantial, more germane, more, to use the term in the settlement agreement, more material, than having an acquittal.

(1/25/84 Tr. p. 57). Mr. Hartzell's terse response was, "I just want to be sure my silence wasn't taken as acquiescence. I'm not taking any position on that." (1/25/84 Tr. p. 61).

Certainly, counsel for Phelps Dodge had no obligation to address the applicability of the most favored nations clause at that hearing but they were clearly on notice as to the meaning plaintiffs ascribed to the clause. Perhaps Phelps Dodge's silence in light of plaintiffs' and Cerro's strong remarks reflected Phelps Dodge's oft-stated desire to terminate its involvement in the litigation as promptly as possible. Counsel for Phelps Dodge continually reminded the court that their client greatly valued a speedy resolution. For example, Henry Reath, Esquire, stated on behalf of Phelps Dodge at a pretrial conference held on February 28, 1984, that:

... Phelps Dodge decided at a time when the criminal case was yet to be tried that for a number of reasons it was in their best interest to get this case settled, and the reason for the settlement and the motivation of the settlement was to avoid further expense, delay, risk of litigation, uncertainty as to where they stand, and it was also motivated in part by the fact that the company then had plans to completely get out of the business and dispose of it and obviously take their lumps, whatever they were, and be done with the whole problem and, frankly, it was our hope then as I think Your Honor knows from the various statements that I have made, and Mr. Hartzell, that we were very anxious to have settlement approved, have it go out and get people on board if necessary, even before the criminal case was tried, but the fact of that matter is that as soon as the criminal case was over, it then became doubly apparent that it was really very important to have it done.

(2/28/84 Tr. pp. 43–44).

In light of plaintiff's evident reliance on the *Corrugated Container* clause and the district court's interpretation of that clause, and Phelps Dodge's predominant desire to end its case promptly (and presumably avoid the risk that a conviction would undoubtedly delay settlement) and counsel's stated familiarity with the district court holding in *Corrugated Container*, we find that plaintiffs believed and Phelps Dodge was on notice that a criminal acquittal would constitute a material change in circumstances.

It therefore remains only to determine whether plaintiffs' belief that the acquittals diminished their prospect of recovery from Cerro was reasonable. In *Corrugated Container*, Judge Singleton found that criminal acquittals resulted in a "dramatic reduction in settlement value of the class case." ¶ 65,451 Trade Reg.Rep. at 70,581. The reason was that a criminal conviction

evidences a *prima facie* case of civil liability,[12] while an acquittal indicates that,

> The United States Justice Department, with all its resources, failed to convince a jury that there existed a price-fixing conspiracy.... Even though there exists a different standard of proof in civil cases, the failure of the Justice Department to prove its case presented a harbinger for the plaintiffs in this civil litigation.

¶ 65,451 Trade Reg.Rep. at 70,581–82. In *Corrugated Container*, the defendants who settled after the acquittals were unindicted co-conspirators who had not stood trial in the criminal case. In this case, Cerro stood trial in the criminal case and was exonerated by a jury. Therefore, the "dramatic reduction" in settlement value which Judge Singleton found was even more pronounced here.

Statements of Mr. Kurland also indicate the importance of a criminal verdict in settlement negotiations. Mr. Kurland stated that "whether there would be an acquittal or conviction was one of the negotiating points in determining the [Phelps Dodge] settlement." (1/25/84 Tr. p. 28). The other defendants waited until after the criminal trial to discuss settlement;[13] only Phelps Dodge did not wait to find out whether its negotiating position would be bolstered by an acquittal or weakened by a criminal conviction. Phelps Dodge made a business decision to settle prior to the criminal verdict; it was terminating its copper water tubing manufacturing and wanted this case "wrapped up." [14] Phelps Dodge's settlement for 2.4% of 1979–82 sales took account of the risk that it might be acquitted and able to settle for less, or that it might be convicted and unable to settle without paying significantly more. Mr.

Kurland testified at the evidentiary hearing,

> ... we tried to negotiate with Phelps Dodge a settlement prior to the roll of the dice in the criminal case, to see if we could make a substantial settlement with them and then hold over their head the fact that if the criminal case was lost, it was a different ball game.

(5/28/85 Tr. p. 49). The most favored nations clause was not inserted in the Phelps Dodge settlement agreement to insulate Phelps Dodge from the risk that other defendants might be acquitted; the clause's purpose was only to ensure that plaintiffs acted fairly and with equal vigor in pursuing settlement with other defendants.

The reasonableness of considering a criminal conviction, and analogously an acquittal, a material change in circumstances is also evidenced by plaintiffs' protracted and hard-fought negotiations with Cerro, some of which are personally known to the judge. Negotiations with Cerro stretched out over many months and settlement was achieved only after the court actively intervened at the parties' request. The court met with principals of Cerro, in the presence of Mr. Sachnoff, in an effort to resolve the lawsuit.

Cerro did eventually settle, but there is no question in this judge's mind that both plaintiffs and Cerro recognized the acquittals as vastly reducing the amount plaintiffs could demand or would receive in settlement. At the January 25, 1984 hearing, Mr. Sachnoff stated:

> ... I'm indicating on the record ... that we also acknowledge that it [acquittal] is a material change in circumstances which when the time comes that we sit down with the plaintiffs and see whether

---

12. Title 15 U.S.C. § 16(a) provides:

A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be *prima facie* evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws as to all matters respecting which

said judgment or decree would be an estoppel as between the parties thereto....

13. On April 29, 1983, this court approved a stipulation of plaintiffs and Cerro (and other defendants in the Master File cases) deferring all but third-party discovery pending the conclusion of the criminal trial.

14. Phelps Dodge ceased to manufacture copper water tubing in late 1983.

or not there is a common ground upon which we can resolve this litigation, that fact is going to be one of the principal factors that's going to be discussed in the context of our settlement negotiations.

(1/25/84 Tr. pp. 58–59). At the May 24, 1985 evidentiary hearing, Mr. Kurland testified,

The fact that we might have a criminal conviction against the defendants was the single most important bargaining tool that was recognized by us and by the defendant Phelps Dodge.... By the time I was settling with Cerro ... [t]here was an acquittal.

(5/24/85 Tr. pp. 48, 63). The behavior of counsel for plaintiffs and for Cerro confirmed these observations.

Phelps Dodge takes issue with the rationality of Mr. Sachnoff's observations; it argues that since an indicted criminal defendant is presumed innocent, Phelps Dodge was in the same position when it settled as formerly indicted but then acquitted Cerro when it settled. However, the grand jury indictment showed plaintiffs and defendants that the grand jurors believed the government had sufficient evidence to indicate that a crime probably had been committed by the corporations and individuals named in the indictment. Therefore, as a practical matter plaintiffs were clearly in a stronger bargaining position against Phelps Dodge when indicted than against Cerro when acquitted.

Phelps Dodge's argument that discovery revealed information sufficiently incriminating to Cerro to "cancel out" the effects of the acquittal is also not persuasive. Without this discovery information, Cerro may well have viewed it so unlikely that a jury would find it civilly liable that it might not have settled at all or settled for a lesser amount. To both plaintiffs and Cerro, the acquittal remained a material factor having a major impact on settlement prospects.

Phelps Dodge also argued that plaintiffs could not have reasonably concluded that the prospect or amount of *ultimate* recovery was lessened or reduced because plaintiffs calculations were all based on the settlement value rather than the ultimate value of the case. Plaintiffs responded that unless it became likely that a trial could not be avoided, they did not attempt to calculate the exact amount of damages against Cerro but instead relied on general parameters. We find it reasonable to rely on general liability figures while involved in settlement discussions. Moreover, on two occasions, plaintiffs provided the court with settlement guidelines it had prepared. These guidelines convinced the court that plaintiffs were making reasonable judgments regarding the basis for settlement with defendants other than Phelps Dodge. (The court was not involved in negotiations culminating in the Phelps Dodge settlement). Plaintiffs' and Cerro's experienced antitrust counsel eventually agreed to settle for .88% of Cerro's 1979–82 sales (as opposed to 2.4% for Phelps Dodge); this is sufficient to indicate plaintiffs' believed the acquittal caused an approximate two-thirds reduction in their likely recovery.

The evidence introduced at the May 24 and May 28, 1985 evidentiary hearing, as well as prior proceedings in this case of which the court takes judicial notice, persuades the court that plaintiffs could and did reasonably conclude that the criminal acquittals constituted a material change in circumstances so that the value of the civil case against Cerro was substantially lessened. Phelps Dodge's assertion that the Cerro settlement triggered its option to invoke the most favored nations clause and obtain a partial refund of its settlement amount fails to convince the court.

An appropriate Order follows.

## ORDER

AND NOW, this 26th day of July, 1985, upon consideration of the motion of Phelps Dodge Industries, Inc. to enforce its settlement agreement, the responses thereto, and for the reasons set forth in the foregoing Memorandum, it is ORDERED that said motion is DENIED. Phelps Dodge may not exercise its option under the most favored nations clause and must comply

with all other terms of its settlement agreement, which remains in full force and effect.