ENTERPRISE–LAREDO ASSOCIATES, Enterprise Development Associates, Meyer Steinberg, Robert James, Lone Star Mall Associates, Related Lone Star, Inc.; and the Center Companies, Appellants,

v.

HACHAR'S, INC., Appellee.

No. 04–90–00714–CV.

Court of Appeals of Texas,
San Antonio.

June 17, 1992.
Rehearing Denied Aug. 27, 1992.

Keith E. Kaiser, A. Michael Ferrill, Cox & Smith, Inc., San Antonio, Horace C. Hall, III, Hall, Quintanilla & Alarcon, Laredo, for appellants.

Stephen D. Susman, James T. McCartt, Susman Godfrey, Houston, Richard G. Morales, Jr., Mark D. Willett, Person, Whitworth, Ramos, Borchers & Morales, Laredo, for appellee.

Before BUTTS, CHAPA and BIERY, JJ.

BIERY, Justice.

This is an appeal from a nonjury trial in which the court awarded to Hachar's, Inc., the appellee, the sum of $3,110,224.62 for actual damages, $200,000 in attorney's fees for the trial and additional fees on appeal, and declaratory relief. The court found that the appellants, Enterprise–Laredo Associates, Enterprise Development Associates, Meyer Steinberg, Robert James, Lone Star Mall Associates, Related Lone Star, Inc., and The Center Company (collectively referred to Enterprise) breached the lease agreement and violated the Deceptive Trade Practices Act.[1] Enterprise chal-

---

**1.** To facilitate the reading of the opinion, all appellants will be referred to as Enterprise. However, the relationship among the appellants is as follows:

1. Enterprise–Laredo Associates—a New York Limited partnership organized to acquire the land for Mall del Norte.

lenges the court's rulings with respect to the actual damage award and the declaratory relief.

In 1975, Enterprise was preparing to build a shopping mall, Mall Del Norte, in Laredo, Texas, and negotiated with Sears, Roebuck & Co. and Hachar to open stores therein. Sears decided not to lease space at the mall but instead purchased its own land and constructed its own building at the mall site. Having purchased the land, Sears entered into a Reciprocal Construction Operation and Reciprocal Easement Agreement (REA) with Enterprise. Unlike Sears, Hachar chose to lease space at the mall and retained an experienced shopping center attorney to represent it in the lease negotiations.

A form lease was drafted by Enterprise as a preliminary document, and both sides negotiated changes. The parties acknowledge the lease was subject to extensive negotiations and revisions. One such revision was the inclusion of Rider 12.21,[2] which was a most-favored-nation provision,[3] relating to the basic common area maintenance charge (CAM charge) in lieu of the originally proposed CAM charge. The CAM charge was to be based on the percentage of square footage occupied by the tenant.[4] The lease was signed by Hachar's, Inc. on September 24, 1975, and Enterprise signed the lease on January 21, 1976.

Hachar moved into its leased space in 1978 and began paying rent and CAM charges. In accordance with the lease, Hachar was billed each month for the rent and the estimated CAM charge, and at the end of each year, the CAM charge was recalculated and any adjustments were made. This procedure continued until problems arose in 1987.

The year-end CAM invoice for 1986 was sent to Hachar in April of 1987 and reflected a substantial increase in the total CAM expense. The substantial increase in the total CAM charge resulted in a corresponding rise in Hachar's charge. Hachar, for the first time since the inception of the lease, exercised its right to seek an audit of the CAM charges which disclosed that the most-favored-nation clause in Rider 12.21 had not been properly followed. After Hachar's discovery was brought to Enterprise's attention, Enterprise reviewed the documents and acknowledged that it had not given Hachar the benefit of the lower CAM charge paid by Dillard. However, Hachar demanded that it be given the benefit of the lower CAM charge paid by Montgomery Ward because Ward was a "mall tenant" pursuant to Hachar's interpretation of the lease agreement. Enterprise denied that Ward was a "mall tenant" under the terms of the Rider because unlike Hachar, Ward owned its own space in the

2. Enterprise Development Associates is the general partner of Enterprise–Laredo Associates and is a New York partnership.
3. Meyer Steinberg and Robert James are the general partners of Enterprise Development Associates.
4. Lone Star Mall Associates is a New York limited partnership and it purchased much of the fee in Mall del Norte in 1984.
5. Related Lone Star, Inc. is the general partner in Lone Star Mall Associates.
6. Center Companies is a Minnesota corporation. Enterprise Development Associates subcontracted many of its management functions to Center Companies in 1984.

2. Although both parties acknowledge that the Rider was inserted, a dispute exists as to whether the language inserted by Enterprise but never initialled by Hachar is binding upon Hachar.

3. A traditional most favored nation clause is an unconditionally worded clause prohibiting, in

this case Enterprise, from making a later CAM charge arrangement with another lessee/tenant on terms more favorable than the CAM charge arrangement entered into with Hachar without giving Hachar the benefit of the later and more favorable arrangement. *See Fisher Bros. v. Phelps Dodge Indus., Inc.,* 614 F.Supp. 377, 381 (E.D.Pa.1985).

4. The portion of the original lease concerning the percentage read in part as follows:

It is understood and agreed that the cost of the aforesaid services, and expenses exceed the basic minimum charge, in which event Tenant shall pay Landlord, within thirty days after receipt of an itemized bill therefor, rendered for the preceding calendar year, Tenant's pro rate share of such annual excess based upon the percentage which the demised premises bears to the total of leasable Mall Area in the Shopping Center (counting Mall Area Tenants without entrances on the mall at 75% of their leaseable square footage).

same manner as did Sears. Consequently, Ward and Sears paid such items as ad valorem taxes separately whereas the CAM charges for lessees included a pro rata share of ad valorem taxes.

The CAM dispute, however, was not the first disagreement between the parties. Throughout the 1980's, Hachar raised several complaints concerning items and events at the mall, including complaints about the location of the Easter Bunny and Santa Claus in front of his store, a leaking roof, and whether the mall had a right to have a kiosk. At one point, Hachar withheld monies allegedly owed to Enterprise under the lease. The parties were able to resolve these disputes, and a settlement agreement was prepared wherein the parties agreed to "waive any other violations of the Lease by Landlord that may have occurred prior to March 31, 1987." Approximately one month after the settlement agreement was signed, the CAM charge dispute arose. The parties were not able to settle the CAM controversy and Hachar filed suit.

In its petition, Hachar alleged that its CAM charge had been miscalculated and asserted claims for breach of contract, breach of warranty, DTPA violations, and misrepresentation. Hachar also requested a declaratory judgment that its CAM charge should be based upon Montgomery Ward's charge or alternatively, upon Dillard's charge. After a nonjury trial, the judge ruled that Hachar's CAM charge should have been based on Montgomery Ward's charge and awarded damages accordingly. Following the court's ruling but prior to the entry of judgment, Enterprise filed a motion to recuse the judge based upon an incident which occurred at the mall several months before trial and involved members of the judge's family. The trial judge refused to recuse himself. The motion was referred to another judge who denied the motion and imposed a $5,000 sanction against Enterprise. The final judgment was entered and this appeal perfected.

Enterprise asserts in its twenty-two points of error, grouped into six categories, that the court erred in: (1) interpreting the controlling instruments; (2) failing to sustain affirmative defenses based upon the settlement agreement; (3) failing to sustain the plea of limitations; (4) concluding the DTPA had been violated and applying the 1977 version requiring automatic trebling of damages; (5) awarding and trebling prejudgment interest; and (6) denying the motion to recuse.

 In point of error thirteen, Enterprise contends the trial court erred in finding and concluding that it violated the DTPA because such a finding is based upon an erroneous legal interpretation of the lease agreement, and the evidence is legally and factually insufficient to support the finding. Although conclusions of law are always reviewable, findings of fact are reviewable where, as here, a statement of facts is contained in the record. *Middleton v. Kawasaki Steel Corp.*, 687 S.W.2d 42, 44 (Tex.App.—Houston [14th Dist.] 1985), *writ ref'd n.r.e.*, 699 S.W.2d 199 (Tex.1985). The findings and judgment of the trial court are controlling on the reviewing court when there is evidence of probative force to support them. *Mercer v. Bludworth*, 715 S.W.2d 693, 697 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). The findings of fact are reviewable for legal and factual sufficiency of the evidence, and the conclusions of law are reviewable when attacked as a matter of law. *Id.*

The trial court found that "[u]nder Rider 12.21 of the lease agreement [Enterprise] had expressly warranted that Hachar would not be required to pay a CAM charge greater (on a square footage basis) than 'that paid by any other Mall Tenant.' " In addition, from the inception of the lease agreement, the court found that Hachar had been charged CAM charges in excess of those required by the lease agreement, and that the most serious error was Enterprise's failure to honor the express warranty in Rider 12.21. The court found the assessment and collection of the grossly excessive CAM charges and the continuation to do so at every opportunity, took advantage of Hachar's lack of knowledge of the facts to a grossly unfair degree. In

addition, the trial court found that Enterprise made false and misleading statements concerning the amount of price reductions that were supposedly being made available to Hachar in the lease agreement and the CAM charge invoices. The court concluded that Enterprise violated the DTPA, section 17.50(a)(2) by breaching the express warranty contained in Rider 12.21, by engaging in an unconscionable course of action in violation of section 17.50(a)(3), and by making false or misleading statements of fact concerning the existence of or amount of price reductions in violation of section 17.-46(b)(11). Enterprise contends that the DTPA does not apply because the sole issue concerns a breach of contract question between sophisticated, well-represented business people as to the proper interpretation of Rider 12.21. We agree.

Mr. Hachar testified that he learned in 1987 that he had not been billed in accordance with Rider 12.21. As previously mentioned, this discovery was made after Hachar's comptroller plugged the year-end adjustment figure for 1986 into his graph. The adjustment showed an inordinate increase which the comptroller was not authorized to pay. After the comptroller brought the increase to Mr. Hachar's attention, Mr. Hachar looked into the matter of the CAM charges more carefully. Further investigation revealed that Enterprise had not complied with the most-favored-nation clause, and upon bringing the noncompliance to the attention of Enterprise, Hachar was billed in accordance with Dillard's CAM charge. However, when Hachar tried to make its own adjustments for the CAM overcharges for the previous years, Enterprise responded with a notice to quit.

Hachar filed suit in February of 1988, and in April of 1989, Enterprise acknowledged that it should have charged Hachar on the basis of the Dillard CAM charge and offered to reimburse Hachar for the amounts overcharged, the legal interest on the differences each year, and reasonable attorney's fees. Hachar declined the offer, intending instead to pursue its remedies in court, and asserting that the CAM charges should be based on the amount paid by Montgomery Ward. According to Hachar's interpretation of the lease, "mall tenant" included all stores having an opening onto the mall even if the store owned its property as opposed to a traditional tenant situation involving a lease. Thereafter, Hachar amended its petition to include allegations of DTPA violations. Enterprise does not dispute that it overcharged Hachar but claims that the CAM charges should be based on those paid by Dillard. Therefore, what remains in dispute is simply whether Montgomery Ward is a "mall tenant" pursuant to the lease agreement.

■ A mere breach of contract allegation, without more, is not a "false, misleading or deceptive act" in violation of the DTPA. *Ashford Dev., Inc. v. USLife Real Estate Serv. Corp.*, 661 S.W.2d 933, 935 (Tex.1983); *Gulf States Underwriters, Inc. v. Wilson*, 753 S.W.2d 422, 430 (Tex.App.—Beaumont 1988, writ denied). It is therefore critical to differentiate a "mere breach of contract claim" from a breach which involves "something more" in the way of a misrepresentation or fraud claim to invoke the DTPA. *Quitta v. Fossati*, 808 S.W.2d 636, 644 (Tex.App.—Corpus Christi 1991, writ denied). Although Hachar may have alleged fraud and/or misrepresentation, its counsel freely admitted at trial that:

> Your Honor, the Court of course understands that the problem here is that by both sides [sic] admission, no one knew or understood at the time this document [letter agreement] was being negotiated or at the time it was being executed, that for a number of years since 1978 or '77, the Defendant had overcharged Hachar's on its CAM charge. I mean, there was an overcharge and neither side understood about it....
>
> ....
>
> ... Neither party knew about the injury in this case.

The distinction between a breach of contract claim and a DTPA violation appears "when an alternative interpretation of the contract is asserted, and the dispute arises out of the performance of the contract." The DTPA is not violated when such a

distinction exists, and traditional contract principles are applied to the dispute. *Id.*

Enterprise relies on the decision in *Group Hosp. Servs., Inc. v. One & Two Brookriver Center,* 704 S.W.2d 886 (Tex. App.—Dallas 1986, no writ), to support its contention that "a DTPA claim cannot be based upon an allegedly erroneous interpretation of a contract." In the *Group Hosp.* decision, the parties had entered into an agreement to lease space in an officer tower. *Group Hosp.,* 704 S.W.2d at 888. Three parts of the lease were in dispute and the tenant claimed that the landlord had violated the DTPA by representing that the agreement conferred or involved rights, remedies, or obligations which it did not have in violation of section 17.46(b)(12) of the DTPA. The court found that recovery under section 17.46(b)(12) was uniformly predicated on factual rather than interpretive misrepresentations. The court went on to state that "[w]e should guard against allowing every breach of contract claim to be elevated into a DTPA claim. We believe that a case must contain some element of overreaching or victimizing the unwary in order to create a DTPA claim. Both parties to this contract were responsible business people, well advised by counsel." In the case before us, both Hachar and Enterprise are sophisticated business people and well represented by counsel.[5] Even Hachar admits that "much of this appeal involves an interpretive dispute (Is Hachar entitled to the Ward CAM charge, or only the Dillard charge?)," but then asserts that "the parties' course of dealing has *not* been a continuing good faith disagreement over the meaning of Rider 12.-21. To the contrary, unknown to Hachar until late 1987, the defendants utterly failed to honor their obligations under the warranty." However, as previously noted, Hachar's counsel openly admitted that at the time the 1987 settlement agreement was being negotiated, no one knew of or understood about the overcharges. In response, Hachar contends that the *Group Hosp.* decision does not apply to this case because that decision involved a section 17.46(b)(12) laundry list violation and not a breach of warranty action.

The DTPA violations asserted in this case include a section 17.46(b)(11) violation, a breach of warranty action under section 17.50(a)(2), and an unconscionable course of conduct under section 17.45(5)(A). Under section 17.46(b)(11), the making of false or misleading statements of fact concerning the amount of price reductions are prohibited. Tex.Bus. & Com.Code Ann. § 17.46(b)(11) (Vernon 1987). In order to violate this subsection, false factual statements must be made about the reasons for, existence of, or the amount of the price reduction. David F. Bragg, Philip K. Maxwell & Joe K. Longley, Texas Consumer Litigation § 3.05.011 (2nd ed. 1983). This section of the act appears to be concerned with price advertising because it is an effective method to promote products and services and has been the subject of considerable abuse.[6] *Id.* Unlike most of the

5. As previously noted, Hachar was represented by a lease expert in negotiating the lease. The record also reflects that Mr. Hachar is a graduate of Wharton School of Financing at the University of Pennsylvania and is the owner of Hachar's Real Estate Corporation and Las Palmas Shopping Center. Mr. Hachar testified that he owns commercial real estate buildings in which he is the landlord, and for twenty or more years he has been owning and leasing real estate and has entered into written leases as a usual course of conduct as a businessman.

6. The subsection of the DTPA concerning pricing violations was developed mainly to prevent price advertising abuse. The following explanation is helpful in determining what type of violations were intended to be covered:

Representing that goods for sale are the inventory of a bankrupt or otherwise distressed party is unlawful if untrue, since such representations convey the false impression that the seller has secured the goods at substantial savings which will likely be passed on in part to the consumer. For much the same reason, it is unlawful to falsely represent that a sale is being held because the seller is bankrupt, is liquidating his inventory, is losing his lease, or is going out of business. The use of the words such as "discount, sale, special, or similar words which impliedly compare the selling price to a regular or prevailing price or which suggest that real savings are being offered are unlawful if there is no regular or prevailing price or if the reduced price is only nominally lower than the regular or prevailing price.

abuses in the pricing area, conveying the false impression that the seller is bankrupt, liquidating its inventory, going out of business or losing its lease, the evidence presented at trial focused on the definition of "mall tenant" and whether the prior settlement waiver precluded any of the recovery sought. There was no evidence to support the assertion that Enterprise made a false or misleading statement concerning the *price* of the CAM charge as set out in the Rider provision.[7] The Rider did not specifically set out a price to be charged for the CAM charge but rather set the basis upon which it would be calculated. Therefore, the only disagreement which remains is the interpretive dispute as to whether the CAM charge formula is to be based upon Montgomery Ward or Dillard. Based upon the facts and circumstances of this case, we hold the dispute does not rise above the level of an interpretation dispute; therefore the DTPA does not apply.

██ The court also found that Enterprise failed to honor the express warranty in Rider 12.21. There are no true DTPA warranties, nor does the DTPA define the term "warranty." *La Sara Grain Co. v. First Nat'l Bank,* 673 S.W.2d 558, 565 (Tex.1984).[8] To be actionable under the DTPA, the warranty must be established "independently of the act." *Id.* An express warranty is created when "a seller makes an affirmation of fact or a promise to the purchaser, which relates to the sale and warrants a conformity to the affirmation as promised." *McCrea v. Cubilla Condominium Corp. N.V.,* 685 S.W.2d 755, 757 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). An express warranty may be created in the context of real estate sales or service contracts in the same manner as it is created in a sale of goods. An express warranty in this con-

text is "any representation of fact or promise as to the title, quality, or condition of existing or future goods or services." Michael Curry, *Common Law Warranties,* in STATE BAR OF TEXAS, ADVANCED DTPA—CONSUMER LAW SEMINAR I–7 to I–8 (1989). A breach of an express warranty is also likely to establish liability as a deceptive trade practice under one of the subsections of section 17.46(b). DAVID F. BRAGG, PHILIP K. MAXWELL & JOE K. LONGLEY, TEXAS CONSUMER LITIGATION § 5.08 (2nd ed. 1983). Therefore, the fact that Hachar chose to claim a breach of an express warranty rather than assert a section 17.46(b)(12) laundry list claim, that Enterprise represented that the agreement conferred rights which it did not have, is not dispositive as to whether the *Group Hosp.* decision is applicable. In fact, the "mere breach of contract" rule, as relied on in *Group Hosp.,* has been applied without examining the section of the Act claimed to have been violated. *Ashford Dev., Inc. v. USLife Real Estate Serv. Corp.,* 661 S.W.2d 933, 935 (Tex.1983). However, before reaching the applicability of the *Group Hosp.* decision, we need to consider if the language of Rider 12.21 did create an express warranty.

██ The language of Rider 12.21 is as follows:

> Landlord warrants that Tenant shall not be required to pay a charge for the use of common areas and common facilities greater on a square footage basis than that [required to be] paid by any other Mall Tenant.[9]

According to Black's Law Dictionary, the term "warrant" means to "engage or promise that a certain fact or state of facts, in relation to the subject-matter, is, or shall be, as it is represented to be." BLACK'S LAW DICTIONARY 1421 (5th ed. 1979). In the

---

DAVID F. BRAGG, PHILLIP K. MAXWELL & JOE K. LONGLEY, TEXAS CONSUMER LITIGATION § 3.05.011 (2nd ed. 1983).

7. The evidence indicated that Hachar's lease was the only lease Enterprise had which contained the most-favored-nations clause.

8. It is unfortunate that the DTPA does not define the term warranty because its meaning at common law is ambiguous. *La Sara Grain,* 673

S.W.2d at 565 n. 4. "Karl Llewellyn, the father of the Uniform Commercial Code, complained that, 'To say warranty is to say nothing definite as to legal effect.'" *Id.*

9. The parties are in disagreement as to whether the bracketed language is a part of the contract because it was inserted after Mr. Hachar had signed the lease and was never initialed by him.

commercial sales setting, a warranty is defined as

a statement or representation made by seller of goods, contemporaneously with and as a part of contract of sale, though collateral to express object of sale, having reference to *character, quality or title* of goods, and by which seller promises or undertakes to insure that certain facts are or shall be as he then represents them. A promise or agreement that the article sold has certain qualities or that seller has good title thereto. A statement of fact respecting the quality or character of goods sold, made by the seller to induce the sale, and relied on by the buyer." *Id.* at 1423 (emphasis added).

As the above definition indicates, warranties commonly extend to the character, quality, or title of goods.[10] In considering whether a warranty had been created, one court stated the following:

'Warranty' is said to be an express or implied agreement 'by which the seller undertakes to vouch for the title, quality or condition of the thing sold.' 'Warranties usually go to the quality, quantity, capacity, condition (or) fitness of property for the purposes for which it is sold....' (Citations omitted.)

*Detroit Automatic Scale Co. v. G.B.R. Smith Milling Co.*, 217 S.W. 198, 199 (Tex. Civ.App.—Dallas 1919, no writ); *see Church v. Ortho Diagnostic Sys., Inc.*, 694 S.W.2d 552, 555 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.) (term "warranty" contemplates contract made and to induce sale, seller undertakes to vouch for quality, quantity, title or condition of thing sold); *see also Southwestern Bell Telephone Co.*

*v. FDP Corp.*, 811 S.W.2d 572, 576 (Tex. 1991) (assurance that new advertisement would be published correctly after previous advertisement contained an error an express warranty); *National Bugmobiles, Inc. v. Jobi Properties*, 773 S.W.2d 616, 621 (Tex.App.—Corpus Christi 1989, writ denied) (any additional treatment called for within one year from the date of this warranty found an express warranty); *Blackwood v. Tom Benson Chevrolet Co.*, 702 S.W.2d 732, 734 (Tex.App.—San Antonio 1985, no writ) (phrase "all work guaranteed for 90 days or 4,000 miles, whichever comes first" found to be express warranty); *Rinehart v. Sonitrol, Inc.*, 620 S.W.2d 660, 662–63 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.) (provision characterized as a "performance warranty" relating to burglar alarm an express warranty). Rider 12.21 in the contract referred to the basis on which the CAM charge was to be calculated and did not relate to the character, quality, or title of the leased space which was the subject of the agreement. What appears to be troubling, however, is the use of the phrase "landlord warrants." Although it is clear that the use of formal words such as "warrant" or "guarantee" are not necessary to *create* an express warranty, it is unclear if the converse is true—allowing the mere use of the words "warrant" or "guarantee" to automatically create an express warranty actionable under the DTPA.[11] TEX.BUS. & COM.CODE ANN. § 2.313(b) (Vernon 1968). We hold that the use of form words such as "warranty" or "guarantee" do not automatically create an express warranty.

The evidence indicates that although the negotiations went back and forth between

---

**10.** Section 2.313 of the Texas Business and Commerce Code sets forth its requirements for creating express warranties as follows:

(a) Express warranties by the seller are created as follows:

(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(2) Any description of the goods which is made part of the basis of the bargain creates

an express warranty that the goods shall conform to the description.

(3) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

TEX.BUS. & COM.CODE ANN. § 2.313(a) (Vernon 1968).

**11.** During the nineteenth century warranties were created only if the words warrant or guarantee were used. *Southwestern Bell Telephone Co. v. FDP Corp.*, 811 S.W.2d 572, 575 (Tex.1991) (historical review of common law warranty).

the parties concerning Rider 12.21, it probably was James Bryant, Hachar's attorney, who wrote the rider. Mr. Bryant testified that "To the best of my recollection, it was my language." In addition, in a letter Mr. Bryant wrote to Mr. Hachar concerning the proposed lease, Mr. Bryant stated that "as a major tenant, you should be entitled to reasonable assurance that in no event shall you be paying higher common area charges than are paid by any other tenant in the center." From the above evidence and the negotiations of the parties, we hold the rider was simply another condition or covenant of the contractual agreement and not an express warranty.

As previously noted, the DTPA was not intended to turn every contract dispute into a DTPA action. In this case, both parties were represented by counsel, there was no overreaching or victimization by one party over the other, and the dispute centered on the interpretation of "Mall Tenant." When the DTPA was enacted in 1973, its purpose was to better protect the consumer. John H. Hill, *Introduction*, 8 St. Mary's L.J. 609, 612 (1977). "If the conduct could mislead the 'ignorant, the unthinking and the credulous,' it violates the law." *Id.* at 613;[12] *see Nagy v. First Nat'l Gun Banque Corp.*, 684 S.W.2d 114, 116 (Tex.App.—Dallas 1984, writ ref'd n.r.e.) (test to determine whether statement is deceptive is whether statement has tendency to deceive the ignorant, the unthinking, the credulous who are governed by appearances and general impressions); *see also Weitzel v. Barnes*, 691 S.W.2d 598, 601 (Tex.1985) (Gonzalez, J., dissenting) (legislature's intent in enacting DTPA to protect the uneducated, unsophisticated, and poor against false, misleading and deceptive practices); *Spradling v. Williams*, 566 S.W.2d 561, 563 (Tex.1978) (federal standard originally used to interpret DTPA—law not made for protection of experts but for public—vast multitude including ignorant, unthinking, and credulous who do analyze but are governed by appearances and impressions in making purchases). There is no evidence in the record to support the proposition that Hachar is poor, uneducated, or unsophisticated. We recognize that the DTPA was amended in 1975 to include partnerships and corporations within the definition of consumer, but the original intent of the DTPA, "to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection" still remains. Tex.Bus. & Com.Code Ann. § 17.44 (Vernon 1987). In dealing with breaches of warranty under the DTPA, it has been suggested that because deceptive and unconscionable acts are inherent wrongs that occur in the making of the contract, the DTPA should only apply to breaches of warranty that are inherently wrong, such as deceptive or unconscionable acts. John Hawkins, Comment, *Breach of Warranty and Treble Damages Under the Texas Deceptive Trade Practices and Consumer Protection Act*, 28 Baylor L.Rev. 395, 398 (1976). The evidence in the case before us shows that when the oversight was called to the attention of Enterprise, it acknowledged its mistake and modified its behavior by adjusting the CAM charge to that paid by Dillard. Thereafter, the dispute arose regarding the status of Montgomery Ward as a mall tenant under the lease. Again, we come full circle to the lease interpretation

12. A study was done in 1975 which revealed that:

twenty-one percent of all Texas adults are either incapable of conducting modern day activities, such as properly filling out a check, or are doing so with difficulty. Another thirty-one percent are only minimally competent to handle day-to-day matters of living. The sad truth is that 2,399,000 Texas adults are incompetent in basic consumer skills, such as being able to figure their change from a twenty dollar bill when looking at a cash register receipt, while 1,682,000 have difficulty figuring how much is deducted from their paychecks—even with the numbers in front of them. Unless we are willing to require basic consumer education and unless we are willing to foot the bill to make it meaningful, consumers will never be able to protect themselves adequately from unwise purchase or deceptive sales practices.

John H. Hill, *Introduction*, 8 St. Mary's L.J. 609, 615–16 (1977).

problem which we find is not a violation of the DTPA.[13]

In addition, the court found that Enterprise engaged in an unconscionable course of conduct under section 17.45(5)(A). Because we find that this case fits the principle that a simple breach of contract claim is not a DTPA violation, this construction has also been extended to cover allegations of unconscionable acts as well. *Gulf States Underwriters, Inc. v. Wilson*, 753 S.W.2d 422, 430 (Tex.App.—Beaumont 1988, writ denied). Accordingly, point of error thirteen is sustained. The remaining three points of error under this group do not need to be addressed as they relate to error involving the application of the DTPA.[14]

In points of error one through four (group I pertaining to the legal interpretation of the instruments), Enterprise contends the court erred in: (1) enforcing Rider 12.21 because there was no agreement as to the rider's language; (2) finding and concluding that Enterprise breached the rider; (3) interpreting the term "mall tenant" in the rider to include Montgomery Ward and all other stores with an entrance onto the mall; and (4) finding and concluding that Hachar was entitled to a declaratory judgment.

In point of error three, Enterprise contends the court erred in finding and concluding that Montgomery Ward is a mall tenant under the terms of the lease agreement. In its findings of fact, the court stated that the evidence established that "in accordance with contemporaneous usage in the business, the Defendant's own usage, the business sense of the parties' bargain, and legal usage—the term "Mall Tenant" includes every occupant at Mall del Norte with an entrance onto the enclosed mall." Enterprise contends that because the lease does not specifically define "Mall Tenant," the term is a question of law. Enterprise also asserts that the interpretation by Hachar, that Montgomery Ward and every other store with an entrance onto the mall is a "Mall Tenant," is an untenable construction. Enterprise states that the only permissible interpretation is that "Mall Tenant" means a tenant of Enterprise and excludes anyone not directly leasing space from Enterprise or anyone who owns its space, i.e. Sears and Montgomery Ward. Enterprise relies on the fact that the lease defines "Mall Area" as "that portion of the 'Shopping Center' which is *owned* by Landlord" (emphasis added), and the fact that it is undisputed that Enterprise does not own the space occupied by Sears and Montgomery Ward.

The lease specifically lists Enterprise–Laredo Associates as the landlord under the fundamental lease provisions. In section 2.1 of the lease, landlord is defined as "the lessee or owner of tracts of land described in Schedule A–2 and shown on Schedule A–1 (with the exception of the southerly tract owned by Sears, Roebuck & Company." [sic] In addition, it is undisputed that Montgomery Ward did not purchase its property until after the lease was signed. Enterprise also contends that in

---

13. We are also aware of the argument which takes issue with the mere breach of contract rule. Mark L. Kincaid, *Rules of Judicial Construction—Making and Arguing the Law in DTPA Cases* in STATE BAR OF TEXAS, ADVANCED DTPA—CONSUMER LAW SEMINAR Q–25 (1991). It is argued that the breach of contract rule would mean that a consumer who wins on contract theories creates a defense to liability under the DTPA. Such a holding is inconsistent with the mandate of the DTPA's liberal construction to protect consumers and is inconsistent with the cumulative remedies provision of section 17.43. *Id.* To allow the mere breach rule to prevail provides a defense to the DTPA conflicting with the rule that the DTPA is not a codification of the common law and the primary purpose of the DTPA to provide consumers with remedies without the burden of proof and overcoming numerous defenses. The decisions using the mere breach rule are loose talk and in fact, the *La Sara Grain* decision was resolved on a different ground. The *Ashford Dev.* decision is mentioned but not distinguished. *Id.*

14. Point of error fourteen involved the automatic trebling of all damages, even though some of the damages were sustained after the 1979 amendments became effective. Point of error fifteen concerned error in the court's finding that Enterprise engaged in "knowing" conduct which resulted in the trebling of damages for overcharges occurring after the 1979 amendment. Point of error sixteen claimed error in the court's failure to sustain Enterprise's bona fide error defense to the DTPA claim.

agreeing under Rider 12.21 to charge Hachar no more than the CAM charged to any other "Mall Tenant," Enterprise could only be reasonably expected to be bound by charges to its own tenants.

 A court will construe a contract as a matter of law if it is unambiguous. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). A contract is unambiguous when it is worded in such a way that it can be given a definite or certain legal meaning or interpretation. *Id.* If the meaning of the contract is uncertain and doubtful, or if the contract is reasonably susceptible to more than one meaning, the contract is ambiguous. Whether the contract is ambiguous is a question of law for the court to determine by viewing the contract as a whole in light of the circumstances present when the contract was made. *Id.* at 394.

 In viewing the contract as a whole, in light of the circumstances present when the contract was made, we find that the contract was not ambiguous. The lease specifically defined "Mall Area" as that portion of the shopping center *owned* by the landlord. Enterprise–Laredo Associates was listed as the landlord in the fundamental lease provisions. Additionally, because it owned its own tract of land, Sears was excluded under the landlord definition in section 2.1 of the lease. Having excluded Sears from the definition of landlord under the lease, it is clear that any other entity purchasing land would be also be excluded. Further, because "Mall Area" was defined as that portion of the shopping center *owned* by the *landlord*, it follows that "Mall Tenant" is one who leases from the *landlord*. In addition, Hachar was made aware of the Reciprocal Easement Agreement with Sears which further clarified the "Mall Tenant" definition.[15] Testimony was also presented that Hachar's, Inc. received services under its lease agreement which are not provided to Sears or Wards; for example Hachar's pays taxes on a pro rata basis, receives liability and fire insurance, and parking lot utilities whereas Sears and Montgomery Ward pay for these expenses on their own. As a result, Montgomery Ward is not a "Mall Tenant" under the provisions of the lease. Point of error three is sustained. The amount of actual damages therefore will be reformed to be based on the CAM charge paid by Dillard, as stipulated by the parties.

In point of error one, Enterprise contends that there was no agreement with respect to Rider 12.21 and therefore, no judgment could be based upon the agreement. The evidence at trial indicated that Mr. Hachar signed the lease agreement first and sent it to Enterprise's counsel, Mr. Kassner. Upon receipt of the lease, Mr. Kassner noticed that several changes needed to be made including the insertion of the words "required to be" immediately before the Rider language "paid by any other Mall Tenant" and sent a letter to Mr. Hachar's counsel, Mr. Bryant, requesting the change.[16] Mr. Bryant responded that he "could live with" the insertion and would recommend it to Mr. Hachar. From that point forward, no mention was made about the Rider and Mr. Hachar never initialled the change. However, in its original petition and in all of its amended pleadings, Hachar quoted the Rider language as containing the "required to be" language, but at trial, Mr. Hachar stated that he did not initial the revision, did not agree to it in the

15. In the Sears and Montgomery Ward Reciprocal Easement Agreements a definition of mall tenant was included and defined "mall tenant" as an occupant other than a department store occupying 60,000 or less square feet of gross leasable area in the developer building. A department store was characterized as an occupant with a lease space containing more than 60,000 square feet in gross leasable area. Because the Montgomery Ward and Sears stores contained over 60,000 square feet, they were department stores whereas Hachar's store, with an area of 55,000 square feet, was a mall tenant according to the Sears agreement. Mr. Hachar testified that it was his understanding that his attorney, Mr. Bryant, reviewed the Sears reciprocal agreement. However, Mr. Bryant testified that to the best of his recollection he never saw the Sears agreement.

16. Section 12.21 Landlord warrants that Tenant shall not be required to pay a charge for the use of common areas and common facilities greater on a square footage basis than that "required to be" paid by any other Mall Tenant.

past, and did not agree to it now or in the future. Enterprise contends the "required to be" language was a material alteration to the contract and when an offeree's acceptance materially changes or qualifies the terms of an offer it is rejected, and the change constitutes a counteroffer. The material alteration in this case completely negated any meeting of the minds between the parties, a fundamental prerequisite to the creation of any agreement. Therefore, Enterprise contends there was no agreement (notwithstanding ten years of operating under the "non-agreement") and we should strike the rider provision from the agreement. We disagree.

▬ Having held that the CAM charges were to be based upon those paid by Dillard, because Montgomery Ward did not fall under the interpretation of "Mall Tenant," we must determine if "required to be" language is a material alteration. The "required to be" language is at issue because Dillard's CAM charge was composed of two components, an interior and an exterior charge. From 1978 to 1982, Enterprise did not ask Dillard to pay the exterior component of the CAM charge. After the suit was filed, Enterprise did bill Dillard for the 1978–1982 charges, but Dillard did not pay. Hachar contends that even if the focus is on the Dillard CAM charges, it would be entitled to damages based on the difference between Hachar's payments and Dillard's actual payments, and the amount would be the same regardless of the "required to be" language. The parties stipulated, at trial, the overcharged amount in the event the CAM charge is to be based upon the Dillard's charge.[17] Therefore, we hold that the "required to be" language did not materially alter the lease. Point of error one is overruled.

In points of error five through eight (group II), Enterprise contends that the court erred in: (1) failing to sustain the affirmative defenses of waiver, release, estoppel, and accord and satisfaction based upon the settlement agreement; (2) concluding the affirmative defenses based upon the settlement agreement are barred by the DTPA; (3) concluding the affirmative defenses were not available with respect to the DTPA claim; and (4) finding and concluding the settlement agreement was induced by fraudulent representations.

The settlement agreement at issue was executed in February of 1987. In that agreement, Hachar agreed to pay Enterprise $144,566.79 in payment for the 1984 real estate taxes, 1985 CAM charges, and the 1985 real estate taxes. In addition, Hachar agreed to waive damages that may have occurred as a result of Enterprise's violation of the lease regarding the use of Center Court; to waive damages caused by Enterprise's failure to maintain the roof of Hachar's store; and "[t]o waive any other violations of the Lease by [Enterprise] that may have occurred prior to March 31, 1987." At trial, the court found that Hachar was not yet aware of the CAM overcharges when it signed the letter agreement, and the consideration for the letter agreement was fixed without any regard for the overcharges. The court also found that the letter agreement was based upon Enterprise's false representations as to the amount of CAM charges due. The court held that the letter agreement did not constitute a waiver, release, or accord and satisfaction of any claim alleged in this suit; and did not estop Hachar from asserting its claims. In addition, the court concluded that the common law defenses were not applicable in the DTPA cause of action, and even if the agreement had the effect that Enterprise now urges, the agreement was voidable because it was induced by Enterprise's material fraudulent misrepresentation.

▬ Waiver is defined as "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987). Ordinarily, the existence of a waiver is a question of fact, based upon what is

17. The parties stipulated that in the event the CAM charge is based on that paid by Dillard, the overcharge amount would be $312,575.26.

said and done. *Lang v. Lee*, 777 S.W.2d 158, 164 (Tex.App.—Dallas 1989, no writ). In determining if a waiver has in fact occurred, the court must examine the acts, words or conduct of the parties, and it must be "unequivocally manifested" that it is the intent of the party to no longer assert the right. *Marriott Corp. v. Azar*, 697 S.W.2d 60, 65 (Tex.App.—El Paso 1985, writ ref'd n.r.e.).

▪ Hachar's position at trial and on appeal is that the letter agreement used the term "waiver," not "release," and because Hachar was not aware of the CAM overcharges at the time it signed the agreement, the waiver did not encompass the overcharges. In response, Enterprise contends that the effect of the settlement agreement cannot be determined simply by taking the term "waiver" out of context. Instead, the parties' intent must be ascertained from the entire instrument and in light of the surrounding circumstances. Enterprise asserts it is clear from the face of the agreement that more than a narrow waiver of claims was intended because in addition to listing the specific known claims, the parties included additional language to cover any other violations that may have occurred prior to March 31, 1987. According to one of the joint venturers, Robert James, the waiver letter was the end result of ten years of problems, and the purpose for the waiver letter was to "shake hands. Start over. See if there was some way that we could handle this situation. I didn't know the difference between a waiver or a release. I did my best to get something signed and I said, 'Get whatever you have to give them, and get this done so we can just start over and then see what we can do.'" Mr. James further testified that he wanted to end it amicably and in such a way that operations could continue in an amicable manner in the future.

Conversely, Mr. Morales, the attorney who represented Hachar in the waiver negotiations, testified that the landlord's waiver was put in the lease first, and its purpose was to get a waiver regarding Hachar's withholding of funds without conceding that a lease violation had occurred. He used the words "may have occurred" because he did not want to admit that there had been a lease violation but wanted a blanket waiver. When he inquired into whether Enterprise would agree to the landlord's waiver he was told he could get it if Hachar were to give Enterprise the same thing. The evidence also indicated that the letter agreement was negotiated by attorneys and as Hachar asserts, they knew the difference between a waiver and a release. Hachar also relies on the subsequent conduct of Enterprise, in not asserting the waiver/release provision when the CAM charge dispute first arose and in waiting for almost two years after the suit was filed before asserting the defenses of release and waiver to support its contention that the letter agreement was indeed a waiver and not a release.

Based upon the foregoing evidence, we conclude that the letter agreement constituted a waiver and as such, Hachar could not waive the CAM overcharges. Point of error five is overruled. Having already held that the DTPA did not apply, we need not address points of error six and seven.[18] We also need not address point of error eight because we have already held the settlement agreement did not waive the CAM overcharges.

In points of error nine through twelve, Enterprise contends the court erred in failing to sustain its limitations defense. More specifically, Enterprise contends the court erred in finding that Hachar did exercise reasonable diligence in discovering the overcharges; in finding and concluding that limitations did not begin to run on Hachar's claims until 1987; and in finding and concluding that Enterprise fraudulently concealed the overcharges.

It is undisputed that Enterprise recalculated the CAM charge at the end of each year and sent Hachar a final statement for

---

**18.** Points of error six and seven concern the availability of Enterprise's affirmative defenses with respect to the DTPA claim.

the year. Mr. Hachar related that the overcharge discovery was made in 1987 when the year end adjustment was received by the comptroller, and the CAM charge increases were inordinate. The comptroller was not allowed to pay any dramatic increases so he brought it to Mr. Hachar's attention. Mr. Hachar "decided that it was time that we looked into the matter a little more carefully, why there was [sic] such increases when in actuality with the growth of the mall tenancy these charges should have decreased."

The trial court found that Hachar reasonably relied upon Enterprise to assess and collect the proper CAM charges. The court found that Enterprise's had superior knowledge of its own billing practices, and knew the amount of CAM charges paid by the other mall tenants. The court also found that Enterprise concealed the fact that the CAM charges were excessive. The court concluded that the limitations period did not begin to run until 1987 because it was not until that time that Hachar knew, or in the exercise of reasonable diligence, should have known about the overcharges. Moreover, the court concluded that Enterprise had succeeded in fraudulently concealing its misconduct until 1987.

 A defendant is estopped from relying on limitations as an affirmative defense when the defendant is under a duty to make a disclosure but fraudulently conceals the existence of the cause of action from the party to whom it belongs. *Borderlon v. Peck*, 661 S.W.2d 907, 908 (Tex. 1983). The estoppel effect ends when the party learns of facts or circumstances that would lead a reasonably prudent person to inquire and thereby discover the concealed cause of action. *Leeds v. Cooley*, 702 S.W.2d 213, 215 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). The injured party must show that the defendant had actual knowledge that a wrong occurred and that there was a determined purpose to conceal the wrong. *Id.* Fraudulent concealment cannot be found when the person does not know of the concealed facts. *Nichols v. Smith*, 489 S.W.2d 719, 723

(Tex.Civ.App.—Fort Worth 1973), *aff'd*, 507 S.W.2d 518 (Tex.1974). Even Hachar recognized that it was not until 1987 that Enterprise became aware of the favored-nations provision, so there is no evidence to support the fraudulent concealment finding. Point of error twelve is sustained.

 With respect to the breach of contract action, a four-year statute of limitations applies. TEX.CIV.PRAC. & REM.CODE ANN. § 16.004 (Vernon 1986). In applying the limitation statutes, a cause of action is generally said to accrue "when the wrongful act effects an injury, regardless of when the plaintiff learned of such injury." *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex.1990). An exception to the general rule is known as the discovery rule and the rule is used to determine when the cause of action accrued. *Id.* The discovery rule tolls the running of the limitations period until the time the injured party discovers or through the use of reasonable care and diligence should have discovered the injury. *Id.* In a breach of contract action, limitations begin to run from the time of the breach, or from the time the plaintiff knew or should have known of the breach, whichever is the later. *El Paso Assocs., Ltd. v. J.R. Thurman & Co.*, 786 S.W.2d 17, 20 (Tex.App.—El Paso 1990, no writ).

Hachar asserts that it reasonably relied on Enterprise to properly calculate the CAM charges and had no reason to audit the CAM expenses until 1987. When Hachar did request an audit, the initial response by Enterprise was to offer its CAM records in Minneapolis. It was not until Hachar's attorney contacted the attorney for Enterprise, that the records were offered in Laredo. Even if Hachar had exercised its right to audit earlier, Hachar contends that it would not have discovered the overcharge as the right to audit merely allowed Hachar to confirm that Enterprise paid the total CAM expenses that they claimed to have paid and not to check the amount of CAM charges paid by the competitor stores. Hachar may have been able to discover a violation of section 5.3 of the

lease but not Rider 12.21 which is the basis of its cause of action.

Enterprise contends limitations began to run at the time of the final CAM charge accounting for each respective year, and Hachar failed to exercise due diligence in discovering the overcharge. Under the express terms of the lease agreement, Enterprise billed Hachar for the CAM charge each and every year beginning in 1978. The bill or year-end accounting was submitted after a recalculation was performed at the end of each year. Therefore, limitations began to run each year as the final accounting was made and was not tolled until Hachar "decided" to question the accounting in 1987. In addition, because the lease agreement gave Hachar the absolute right to audit its CAM charges each and every year, the discovery rule does not apply.[19] Hachar's lack of diligence is evidenced by the fact that the year-end adjustment report, provided to Hachar each year by Enterprise, clearly reflected that Sears and Ward were excluded from the amount of gross leasable area upon which Hachar's CAM charge was based.[20] Therefore, Enterprise asserts that Hachar was on notice of the CAM overcharge whether it occurred pursuant to section 5.3 of the lease agreement or section 12.21 of the rider.

There is no dispute that both parties were aware of Rider 12.21 when the lease agreement was signed. Although Hachar contends that it relied on Enterprise to properly calculate the CAM charge, there is no evidence of a confidential relationship between the parties and even if one existed, the discovery rule does not excuse a party from exercising reasonable diligence in protecting its own interests. *Johnson v. Abbey*, 737 S.W.2d 68, 70 (Tex. App.—Houston [14th Dist.] 1987, no writ). The rule expressly mandates the exercise of reasonable diligence to discover facts of negligence or omission. *Black v. Wills*, 758 S.W.2d 809, 815 (Tex.App.—Dallas 1988, no writ). The burden is on the party seeking to benefit from the discovery rule to establish its applicability. *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex.1988).

Whether reasonable diligence was exercised to discover the fraud is usually a question of fact unless the evidence is such that reasonable minds may not differ as to its effect; then it becomes a question of law. *Wakefield v. Bevly*, 704 S.W.2d 339, 346 (Tex.App.—Corpus Christi 1985, no writ). The judge as the trier of fact determined that Hachar did exercise reasonable diligence. The evidence showed that Enterprise was in charge of preparing the year-end reports and recalculating the CAM charges. Mr. Hachar testified that the increases over the years were not so inordinate as to put Hachar on notice of any problem until 1987. The 1987 increases seemed unreasonable because the tenancy in the mall had grown which should have resulted in decreased CAM charges. In addition, Enterprise admits that even it did not "discover" the error until 1987 so to require Hachar to have discovered it earlier seems to require more than an exercise of reasonable diligence. We find sufficient evidence to support the trial court's ruling that Hachar's claim is not barred by limitations and overrule points of error nine through eleven.

In points of error seventeen through nineteen, Enterprise asserts the court erred in its calculation of prejudgment interest. More specifically, Enterprise claims the prejudgment interest should not have been compounded annually (point of error seventeen); prejudgment interest is not a compo-

---

19. Additional language was inserted into the preprinted form lease in section 5.3 of the lease which provided in part: "Tenant may audit Landlord's records annually to verify common area charges."

20. Enterprise contends that from the beginning Hachar had in its possession a plat which showed the amount of gross leasable area, including Sears, to be approximately 580,000 square feet. At that time, Montgomery Ward was not yet in existence. A review of the year-end adjustments sent to Hachar each year showed the leaseable area, as defined in the lease, to be in a range from 527,293 to 529,599 square feet. Based on this information, Hachar was on notice that both Sears and Montgomery Ward were not included in the leaseable mall area used to compute the CAM charges.

nent of actual damages (point of error eighteen), and the compounded prejudgment interest should not have been trebled (point of error nineteen). We need not address points eighteen and nineteen as they deal with damages recovered pursuant to the DTPA, and we have held the DTPA inapplicable.

Enterprise asserts, in point of error seventeen, that the court erred in awarding Hachar prejudgment interest compounded annually. Enterprise claims the only possible justification for the award of prejudgment interest is under the equitable prejudgment interest theory expounded in *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985). Following the *Cavnar* opinion, the supreme court used the postjudgment rate of interest, as specified in TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 3 (Vernon 1987), as the prejudgment rate of interest to be used in contract cases when the damages were not ascertainable from the face of the parties' contract. *Rio Grande Land & Cattle Co. v. Light,* 758 S.W.2d 747, 748 (Tex.1988); *Perry Roofing Co. v. Olcott,* 744 S.W.2d 929, 930–31 (Tex.1988). Enterprise contends that because the *Rio Grande* and *Perry Roofing* cases did not involve a DTPA claim and because Hachar elected to take its judgment under the DTPA, prejudgment interest is not authorized, and prejudgment interest is not necessary to make Hachar whole. Alternatively, even if prejudgment interest is authorized, Enterprise maintains that it should not have been compounded. Compound interest is disfavored in the law and TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 3 does not authorize the compounding of prejudgment interest.

 Having already determined that the DTPA is not applicable, we hold that prejudgment interest may be awarded on a breach of contract claim. *See McCann v. Brown,* 725 S.W.2d 822, 825 (Tex.App.—Fort Worth 1987, no writ) (courts have equitable as well as statutory authority to award prejudgment interest in a contract action). Prejudgment interest is awarded to compensate the plaintiff for the loss of the "opportunity to invest and earn interest on the amount of damages." *Matthews v. DeSoto,* 721 S.W.2d 286, 287 (Tex.1986); *Commonwealth Lloyd's Ins. Co. v. Thomas,* 825 S.W.2d 135, 150 (Tex.App.—Dallas 1992, n.w.h.). We also find the trial court was correct in compounding the prejudgment interest. *OKC Corp. v. UPG, Inc.,* 798 S.W.2d 300, 308 (Tex.App.—Dallas 1990, writ denied) (annual compounding of prejudgment interest upheld in a contractual dispute); *see Winograd v. Willis,* 789 S.W.2d 307, 312 (Tex.App.—Houston [14th Dist.] 1990, writ denied) (article 5069–1.05 § 2 as amended requires prejudgment interest to be compounded annually).

When the contract is silent as to the measure of damages, article 5069–1.05 provides the rate to be used in calculating prejudgment interest awards. *Rio Grande Land & Cattle Co.,* 758 S.W.2d at 748; *OKC Corp.,* 798 S.W.2d at 308. Section 2 of article 5069–1.05 provides that "all judgments, together with taxable court costs, of the courts of this state earn interest, compounded annually...." TEX.REV.CIV.STAT. ANN. art. 5069–1.05 § 2, (Vernon Supp. 1992). Section 6 of the same article provides for prejudgment to be computed as simple interest, but this section concerns judgments in wrongful death, personal injury, and property damage cases. *Id.* at § 6(a), (g). The article also provides for computation of prejudgment interest as simple interest in condemnation cases. *Id.* at § 7. In amending article 5069–1.05, it appears the legislature has singled out the types of cases requiring prejudgment interest to be computed as simple interest. There is no language in the statute which precludes courts from following the supreme court decisions in *Rio Grande Land* and *Perry Roofing* and awarding prejudgment interest using the rate set out in section 2 of article 5069–1.05. We hold the trial court was correct in awarding prejudgment interest and requiring it to be compounded annually. Points of error seventeen and nineteen are overruled.

In points of error twenty through twenty-two, Enterprise contends the trial court erred in denying its motion to recuse the trial judge. Enterprise contends it was denied a fair trial and in addition, contends

the court erred in imposing sanctions on it for bringing the motion to recuse. Hachar asserts that Enterprise did not timely file its motion, and the motion for recusal was lacking in merit. Hachar maintains that the sanctions award was appropriate because the motion was brought without sufficient cause and for delay.

The incident that prompted Enterprise to file its motion for recusal happened in August of 1988, approximately six months after Hachar had filed its suit against Enterprise.[21] The incident involved a member of the trial judge's family. It was not until almost two years later, on July 30, 1990, that trial on the merits took place. Enterprise claims that it was not until the trial was over that the incident was brought to its attention.

■■■ Rule 18a of the Texas Rules of Civil Procedure provides that "[a]t least ten days before the date set for trial or other hearing in any court ... any party may file with the clerk of the court a motion stating grounds why the judge before whom the case is pending should not sit in the case." The rule also provides that if a judge is assigned to the case within the ten days prior to trial, the motion is to be filed at the earliest practicable time prior to the commencement of the trial. TEX.R.CIV.P. 18a(e). These procedural requirements are mandatory and the failure to comply waives the right to complain. *Vickery v. Texas Carpet Co.,* 792 S.W.2d 759, 763 (Tex.App.—Houston [14th Dist.] 1990, writ denied).

Enterprise contends it was not aware of the incident until after the trial primarily because the trial judge did not advise them of the incident. In addition, it contends that Rule 18b requires a judge to recuse himself in any proceeding in which his impartiality might reasonably be questioned or in which he has a personal bias or prejudice concerning a party. TEX.R.CIV.P. 18b(2)(a), (b). Enterprise concludes that it could not reasonably be doubted that the judge was required to recuse himself in this matter.

■■■ In support of its assertion that it could properly file a motion to recuse the judge after the trial because of its lack of knowledge, Enterprise relies on the concurring opinions of Justices Spears and Gonzalez in *Sun Exploration & Prod. Co. v. Jackson,* 783 S.W.2d 202 (Tex.1989). Justice Spears favored allowing Sun to present its motion for recusal in that case because Sun did not know of the trial judge's relationship with the Jacksons and their attorney and therefore could not waive its right to request a recusal. *Id.* at 206–07 (Spears, J., concurring). Justice Gonzalez proposed that Rule 18a should allow a late filing of a motion to recuse if it is grounded on reasons not known and good cause is shown thereby making make Rule 18a comparable to the appellate rule concerning recusal. *Id.* at 208 n. 3 (Gonzalez, J., concurring); *see* TEX.R.APP.P. 15(a). However, we have not found that Rule 18a has been amended to allow late filing.

■■■ In addition, a hearing was held concerning the motion to recuse. Another judge presided at that hearing and denied the motion to recuse. An abuse of discretion standard is applied in reviewing the denial of the motion. TEX.R.CIV.P. 18a(g).

At the hearing, the recusal motion judge heard evidence concerning the incident that happened at the mall. There was evidence that the general manager at Mall del Norte, the person who brought this incident to Enterprise's attention after trial, had been a party to the original suit, although non-suited in 1989, and had been present during the trial. The mall manager testified that she did not notify Enterprise or its counsel of the incident at the mall because, "[w]ell, the lady did not come to talk to me and I thought we do have incidents similar to this at the Mall ..." She also testified that she found out the particular trial judge was going to try the case about ten days before the trial. At one point during the hearing, the recusal motion judge stated:

> The Court is being asked to assume that [the trial judge] remembered, recalled

---

21. The lawsuit was filed in February of 1988, and the incident occurred on August 20, 1988.

the incident, when it occurred at the Mall, and that he should have timely advised or informed counsel of the incident one. The Court, as I understand it, and correct me if I'm wrong, is also being asked to assume that the members of the Mall or the defendants in this case did not, themselves, or did themselves recall the incident but did not apprise counsel of the incident in a timely manner before the Bench trial. I believe those are crucial issues. If I'm mistaken, correct me.

The test for abuse of discretion is whether the trial court acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). "The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstances does not demonstrate that an abuse of discretion has occurred." *Id.* at 242. The recusal motion judge in this instance heard testimony from the mall manager and other individuals involved in the incident and determined that the incident did not merit a recusal. Enterprise has failed to show how the judge abused his discretion. Points of error twenty and twenty-one are overruled.

 In point of error twenty-two, Enterprise contends the court erred in imposing sanctions on it for bringing the motion to recuse. Under Rule 18a(h), if the recusal motion judge determined that the motion to recuse is brought for the purpose of delay and without sufficient cause, the judge may, in the interest of justice, impose sanctions. Tex.R.Civ.P. 18a(h). Although Enterprise claimed that it did not bring the motion for the purpose of delay, the judge found otherwise. In its brief, Enterprise addresses this point in a footnote claiming that because counsel stipulated that interest would run from the time of trial until the time judgment was entered, it erased any suggestion that the motion was brought for delay. We do not find the court abused its discretion it awarding

sanctions and likewise, overrule point of error twenty-two.

Accordingly, the judgment of the trial court is reformed to delete additional damages under the DTPA. The judgment is further reformed to reflect actual damages, as stipulated by the parties, in the amount of $312,576.26 plus prejudgment and postjudgment interest, and attorney's fees in the amount of $220,000. As reformed, the judgment of the trial court is affirmed.

CHAPA, J., concurs with results.